UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| H.S., EXECUTOR OF THE ESTATE OF N. A. AND ASSIGNEE OF JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>THE PHOENIX INSURANCE COMPANY and THE INDEMNITY COMPANY OF AMERICA,<br><br>Defendants | CIVIL NO. 14CA14039 (GAO) |

**OPPOSITION OF PLAINTIFF, H.S., EXECUTOR OF THE ESTATE OF N.A. AND ASSIGNEE OF JOHN DOE, TO THE MOTION TO DISMISS**

Plaintiff, H.S. ("H.S.") [1], Executor of the Estate of N.A. and Assignee of John Doe ("Doe"), hereby opposes the Motion to Dismiss ("Motion") filed by Defendants, The Phoenix Insurance Company ("Phoenix") and The Travelers Indemnity Company of America ("Travelers Indemnity") (hereafter collectively, "Travelers").

## I. INTRODUCTION

As addressed in detail below, H.S., as executor of N.A.'s estate, raised claims against Doe for his negligence and other misconduct and Doe timely reported the claims to Travelers, his homeowner's insurance companies. Travelers refused to provide coverage *in toto* – they refused to defend Doe against the claims, to indemnify him, to participate in mediation despite Doe's request, to undertake reasonable investigation into the claims, to file a declaratory judgment action to determine coverage, or to do anything else to provide Doe any benefits under the Policy. After mediation, without Travelers' participation, Doe settled with H.S. for $500,000

[1] The original Complaint identifies the true names of the parties and interested persons. In light of the Motion of Attorney John Doe to Identify Him, the Executor and Plaintiff Estate by Pseudonyms, pseudonyms are used herein.

and Doe subsequently assigned his claims for coverage to H.S., giving rise to this action. H.S. brings claims for breach of contract, breach of the implied covenant of good faith and fair dealings, negligence, negligent misrepresentations, fraud, and violations of G.L. c. 176D and c. 93A. As set forth below: (1) Travelers had a duty to defend Doe against H.S.'s claims even in the absence of a lawsuit because H.S.'s pre-suit demand letters triggered their duty to defend; (2) H.S. has viable claims for negligence and breach of contract arising out of the assignment of Doe's claims and as a third-party beneficiary of Doe's insurance policy; and (3) Travelers breached their duty to settle because they had an obligation to effectuate a prompt settlement of H.S.'s claims inasmuch as Doe's liability was reasonably clear and the claims were covered under the Policy.

## II. FACTS

The following facts are set forth in the Complaint, which the Court should accept as true for purposes of the Motion. See Argument A, infra, at 7.

### A. The Death of N.A.

H.S. and N.A. were married in Winnetka, Illinois, in August, 1994. They had one child (the "Son") who lives in Newton, Massachusetts with H.S. At all times material hereto Doe was a Massachusetts attorney and also a licensed social worker. In January, 2011, Doe met N.A. They discussed possible divorce proceedings and N.A.'s desire for reconciliation with her husband, H.S. In May, 2011, Doe commenced divorce proceedings on behalf of N.A. Complaint par. 6-9.

Early in the course of representing N.A., Doe learned that N.A. suffered from severe depression and anxiety, had suicidal tendencies and was in need of medical and psychological care and treatment for those conditions. Doe learned that she had been prescribed a number of anti-depressant and anti-anxiety medications, including but not limited to: IC Propranolol (10MG),

Seroquel (25MG), Campral (333MG), Alprazolam (.5MG), IC Butal-ASA-CAFF, and IC Amitriptyline (25MG). Doe also learned that N.A. had recently attempted suicide by taking an overdose of Alprazolam, Seroquel, and Butalbital and had been hospitalized at Newton Wellesley Hospital. Further, Doe learned that, as a consequence of N.A.'s suicidal ideations, she was admitted into an intensive care unit at Brookhaven Hospital in Seymour, Tennessee. Id. par. 10-12.

Doe knew or should have known that N.A.'s marital difficulties were exacerbating her precarious psychological condition and causing her to become increasingly depressed and suicidal. Doe also knew or should have known that without proper medical and psychological care and treatment, N.A.'s condition would not improve and could continue to deteriorate. Nevertheless, with full knowledge of N.A.'s severe disabilities and vulnerabilities, Doe seduced her and began a sexual relationship with her. Sexual liaisons took place in part at hotels and also at Doe's home in Wayland, Massachusetts, which are premises insured by Travelers. Id. par. 13-16.

Through this intimate relationship, Doe caused N.A. to become alienated from her husband, H.S., and the Son, which had the predictable effect of distancing her from the love and support which H.S. and the Son provided. By way of example and without limitation, Doe would kiss N.A. on the mouth in front of the Son, which greatly disturbed the Son and contributed to the Son's alienation from his mother. Id. par. 17-18.

Several months after the relationship of trust and reliance began, and despite having undertaken the role as N.A.'s source of support and care, Doe exacerbated N.A.'s already fragile psychological state through a series of abandonment and reunions. Doe would, in succession, abandon her and then draw her back emotionally into an intimate relationship, then withdraw his support again. Doe's pattern of alternating affection and abandonment exacerbated N.A.'s depression, suffering and suicidal ideations. Doe knew or should have known that his conduct was

causing N.A. severe emotional distress. N.A.'s contemporaneous diaries and journals describe how she was initially drawn in by Doe's affection for her, and then how she suffered great heartache and loneliness when he abandoned her. On August 14, 2011, she wrote, "[John Doe] -- ...I love you, don't you realize that? and isn't it pretty obvious my heart can't take one more break – isn't it obvious?" Id. par. 19-22.

On or about October 1, 2011, after Doe promised to come to her apartment but then chose not to do so, N.A. drank herself to death. When Doe finally arrived at her apartment approximately the next day, he entered through an unlocked window where he discovered her body. The cause of death as noted on her Certificate of Death was ethanol abuse. *N.A.'s suicide note is addressed to Doe and states, "[w]here were you [John Doe], you said you'd come, even if it was 3 am – it's so hard for me not to conclude – I just didn't matter enough to anyone – how pathetic."* Id. par. 23-24.

N.A. was 48 years old at the time of her death, earning about $180,000 with benefits and she contributed substantially to the upkeep of the household. Doe's conduct was a significant factor in, and the precipitating cause of, N.A.'s death. Both H.S. and the Son have suffered severe emotional distress and pecuniary harm as a result of Doe's actions. Id. par. 25-27.

### B. Efforts to Obtain Coverage under the Policy

At all times material hereto, Doe was insured under a Homeowners Policy (the "Policy"), Ex. A appended, with Travelers. On or about October 15, 2012, H.S. served upon Doe a written demand for relief pursuant to G.L. c. 93A, §9 ("October 2012 Demand Letter"), Ex. B appended. Doe promptly put Travelers on notice of H.S.'s claim. Id. par. 5, 28-30.

By letter dated September 11, 2013 ("September 11, 2013 Denial Letter") Travelers denied coverage, asserting that the Policy did not apply because (1) N.A.'s death was not accidental in nature and thus not an "occurrence", under the Policy and (2) the damages arose out of the provision

of professional legal services by Doe because he represented N.A. in divorce proceedings. On or about September 19, 2013, H.S. served upon Travelers a written demand for relief pursuant to G.L. c. 93A, §9 ("September 2013 Demand Letter"), Ex. C appended, for unfair claim settlement practices in violation of G.L. c. 176D. The September, 2013 Demand Letter, Ex. C, made clear that this claim constituted an "occurrence" under the Policy, triggering coverage, and that the occurrence did not arise out of the rendering or failure to render professional legal services. In particular, without limitation: (a) the Policy, Section II(E), provides for personal liability coverage including bodily injury and property damage up to $500,000; (b) Doe was not acting in his capacity as N.A.'s lawyer when he was seducing, engaging in sexual relations with her and abandoning her; (c) sexual relations are not part of the provisions of legal services; and (d) the relationship between Doe and N.A. was a substantial contributing factor in her suicide, and Doe knew or should have known that N.A. was at risk of suicide as indicated in the expert report of Dr. Renee Sorrentino, appended to the September 2013 Demand Letter as Ex. C. In sum, the September 2013 Demand Letter, Ex. C appended, demonstrated that liability, damages and causation were all reasonably clear, triggering Travelers' obligation to effect a prompt, fair, and equitable settlement pursuant to G.L. c. 176D. Travelers nevertheless failed and refused to make any offer of settlement. Id. par 31-35.

H.S. and Doe both informed Travelers that all parties to the dispute (including H.S., Doe, Doe's former law firm and several other insurers) had agreed to mediate the dispute before a professional mediator and urged Travelers to participate, but Travelers failed and refused to do so. In a further attempt to obtain coverage, by letter dated October 8, 2013, Doe informed Travelers that H.S. had raised a claim for negligent infliction of emotional distress which was a covered claim under the Policy. Id. par. 36-37.

On or about the next day, October 9, 2013, Travelers contacted Doe's counsel by telephone and took a new and entirely different position, namely that there was no coverage because Doe owed no duty to N.A. from a failed romantic relationship. In response, and in a final effort to obtain coverage, by letter dated October 15, 2013, Doe advised Travelers that "lack of duty" is a defense which could be raised against a negligence claim, but is not an exclusion or other ground for denying coverage. Despite the fact that liability was reasonably clear, Travelers nevertheless continued to deny coverage under the Policy, Ex. A, failed to participate in mediation, and failed and refused to tender a reasonable offer of settlement. Id. par. 38-40.

On or about March 27, 2014, Doe settled H.S.' claims against him for $500,000 and Doe assigned to H.S. all of his rights and interests under the Policy, Ex. A, as it applied to any claim, action or proceeding arising out of the death of N.A. Doe also assigned to H.S. all claims against Travelers arising out of Travelers' breaches of its contractual obligation to indemnify, defend and protect Doe under the Policy, Ex. A, (the "Settlement"). Pursuant to the Settlement, Doe owes H.S. $500,000. Id. par. 41-42.

Doe demanded that Travelers pay the $500,000 which he owes to H.S. pursuant to the Settlement as well as the attorney's fees and costs incurred by Doe, but Travelers has failed and refused to do so. On or about August 29, 2014, H.S. served upon Travelers Indemnity, and on or about September 1, 2014, H.S. served upon Phoenix, a written demand for relief pursuant to G.L. c. 93A, §9 ("2014 Demand Letters") for unfair claim settlement practices in violation of G.L. c. 176D for the foregoing conduct including but not limited to failing to pay the $500,000. In the 2014 Demand Letters, H.S. demonstrated that liability, damages and causation were all reasonably clear, triggering Travelers' obligation to effect a prompt, fair, and equitable settlement pursuant

to G.L. c. 176D. Travelers nevertheless failed and refused to make any offer of settlement. Id. par. 43-46.

## III. ARGUMENT

### A. THE MOTION MUST BE DENIED BECAUSE THE COMPLAINT SETS FORTH CLAIMS FOR RELIEF.

Travelers bears a heavy burden in order to succeed on their Motion which they cannot possibly meet in light of the factual allegations asserted in the Complaint. A motion to dismiss for failure to state a claim must be denied where the complaint, "contains[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (1970). A claim is plausible, "when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." Ashcroft, 556 U.S. at 678. The complaint should not be dismissed if the factual allegations are "enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp., 550 U.S. at 555. A "well-pleaded complaint may proceed even if it appears 'that recovery is very remote and unlikely.'" Id. at 556 quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). The Court must accept all factual averments in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992). The Court is required to look only to the allegations of the complaint and if under "any theory" they are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. Knight v. Mills, 836 F.2d 659, 664 (1st Cir. 1987).

Doubts or misgivings as to whether a claim is provable or even credible are not a proper basis for dismissal of a claim under Rule 12(b)(6). Friedman v. City of Overland, 935 F. Supp.

1015, 1017 (E.D. Mo. 1996). Under Rule 12, all facts well pled, and the reasonable inferences therefrom, must be taken in the light most favorable to the plaintiffs. Harper v. Cserr, 544 F.2d 1121, 1122 (1st Cir. 1976); Williams v. HealthAlliance Hospitals, Inc., 135 F. Supp. 2d. 106, 109 (D. Mass. 2001).

## B. TRAVELERS HAD A DUTY TO DEFEND DOE AGAINST THE CLAIMS MADE BY H.S., BUT FAILED TO DO SO.

Pursuant to the plain language of the Policy, Ex. A, Travelers had a duty to defend Doe against the claims made by H.S. in his October 2012 Demand Letter, Ex. B, but they failed to do so. The Policy, Ex. A, requires coverage "if a claim is made or a suit is brought".[2] Therefore, contrary to Travelers' assertions, the duty to defend arises from a claim alone. It is not triggered solely by a law suit. See Memorandum of Law In Support of Defendants' Motion to Dismiss ("Defendants Memo") at 6-7.

The plain language of the Policy, Ex. A, is consistent with well-established law. Massachusetts, like other states, does not require a formal lawsuit in order to trigger the duty to defend. The duty may be triggered where no actual complaint has been filed. Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 696, 555 N.E. 2d 576, 581 (1990); Liberty Mut. Ins. Co. v. Black & Decker Corp., 2005 WL 102964, *4 (D. Mass 2005).

---

[2] The Policy, Ex. A, Section II Liability Coverages, Coverage E – PERSONAL LIABILITY provides:

If a claim is made or a suit is brought against any insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, even if the claim or suit is false, we will:

i. Pay up to our limit of liability for the damages for which the insured is legally liable. Damages including prejudgment interest awarded against the insured; and

ii. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the occurrence equals our limit of liability.

(Emphasis added.)

H.S.'s October 2012 Demand Letter, Ex. B, was sufficient to trigger Travelers' duty to defend under the three pronged test enunciated in Zecco, Inc. v. Travelers, 938 F. Supp. 65, 67 (D. Mass. 1996). Therein the Court suggested three guidelines to consider in determining whether a pretrial letter is sufficient. First, "a failure to comply with the letter should itself somehow alter the substantiality of the insured's liability, by making liability more likely or more devastating or by giving rise to some particular penalty." Id., at 68. Second, letters from government agencies are more significant than those from private parties. Third, the tone of the letter is relevant, and a polite offer to discuss matters is less consequential than an offer "the recipient cannot refuse." Id.

Here, when H.S. served upon Doe the October 2012 Demand Letter, Ex. B, Doe was immediately exposed to a greater likelihood of liability and a heightened penalty if he did not respond. The failure to timely respond to a c. 93A demand letter within thirty days would have exposed Doe to double or treble damages if the Court found that his refusal to grant relief upon demand was made in bad faith or with knowledge or reason to know that the act or practice complained of violated c. 93A, §2. Id., §9. Further, the "tone" of the October 2012 Demand Letter, Ex. B, was not a "polite offer to discuss" but, rather, was in the nature of an "offer the recipient [Doe] cannot refuse" or else he would be sued. Zecco, 938 F. Supp. at 68. To be sure, H.S. is not a governmental agency, however, the relevant guidelines set forth in Zecco establish Travelers' duty to defend.

It is important to note that the damages H.S. claims arising out Travelers' failure to defend Doe are minor compared with the damages arising out of Travelers' duty to indemnify. Thus, even if the Court should find that Travelers had no duty to defend Doe, that would not negate Travelers' obligations to indemnify Doe as set forth below.

## C. H.S. HAS VIABLE CLAIMS FOR NEGLIGENCE AND BREACH OF CONTRACT ARISING OUT OF THE ASSIGNMENT OF CLAIMS WHICH SHOULD NOT BE DISMISSED.

H.S.'s claims should not be dismissed because he has raised viable claims for negligence and breach of contract arising out of a valid assignment of claims.[3] This is because: (1) the plain language of the Policy, Ex. A, and established case law require coverage for such claims, (2) a settlement agreement need not be reduced to a judgment to be enforceable, and (3) public policy favors the enforcement of valid settlement agreements.

### 1. The Plain Language Of The Policy And Established Case Law Require Coverage.

The plain language of the Policy, Ex. A, and established case law require coverage. A settlement agreement is legally enforceable and need not be reduced to a judgment to be enforceable. The duty to indemnify may be triggered by such settlements. The Policy, Ex. A, at 40, states in pertinent part:

> If a claim is made or a suit is brought against any **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, even if the claim or suit is false, we will:
>
> a. Pay up to our limit of liability for the damages for which the **insured** is legally liable. Damages include prejudgment interest awarded against the **insured**
>
> . . .

(Emphasis in original.) A settlement agreement is a legally enforceable contract. Malave v. Carney Hosp., 170 F. 3d 217, 220 (1st Cir. 1999). A contract obligates each party to comply with its terms, and failure to so comply renders the breaching party legally liable to the other. Damiano v. National Grange Mut. Liability Co., 316 Mass. 626, 629, 56 N.E. 2d 18, 20 (1944);

---

[3] Travelers has not challenged H.S.'s other claims in Defendants Memo, and therefore H.S. does not address them herein.

Hagan v. Riley, 79 Mass. 515, 516 (1859). Therefore, pursuant to the plain language of the Policy, Ex. A, Doe is legally liable to H.S. under the settlement agreement.

Contrary to Travelers' assertions, Defendants Memo at 9-10, the Policy, Ex. A, does not require that the damages for which the insured must be "legally liable" be reduced to a judgment before Travelers has a payment obligation. If Travelers intended to make this a prerequisite to their indemnification obligation, the burden was on them to put that provision in the Policy, Ex. A. Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 281, 675 N.E. 2d 1161, 1164-65 (1962). Policy language is to be read using the plain meaning of the words. 116 Commonwealth Condo. Trust v. Aetna Cas. & Sur. Co., 433 Mass. 373, 376, 742 N.E. 2d 76, 78 (2001). The language of a policy is construed narrowly and against the draftor. Kelleher v. American Mut. Ins. Co. of Boston, 32 Mass. App. Ct. 501, 504, 590 N.E. 2d 1178, 1180 (1992). Thus, the Policy, Ex. A, itself requires Travelers to indemnify Doe under the settlement agreement even without a judgment.

Where a settlement is reached, the Policy, Ex. A, requires indemnification. The duty of an insurer to indemnify valid settlements based on meritorious claims is well-established. As stated by the Appeals Court;

> When an insurer unfairly fails to settle, the interests of the injured party and the insured may align. See e.g., DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 93-95 & n.8, 449 N.E. 2d 1189 (1983) [footnote omitted]; Compare Campione v. Wilson, 422 Mass. 185, 192-193, 661 N.E. 2d 658 (1996) (assignment of claim against insurance brokers). … In such circumstances, it is not uncommon for the insured to settle with the claimant, especially in cases where liability is clear, and then assign to the claimant his or her rights to sue the insurer for the unfair claim settlement practice. See generally DiMarzo, supra; Campione, supra at 190-191, 661 N.E. 2d 658.

Gore v. Arbella Mut. Ins. Co., 77 Mass. App. Ct. 518, 526, 932 N.E. 2d 837, 845 (2010). Therein, the insurer's liability on the assignment was affirmed. Id.

The SJC has likewise ruled that an insurer must indemnify valid settlement agreements, leaving it to the plaintiff to establish that the settlement arises out of a meritorious claim. In Campione v. Wilson, 422 Mass. 185, 661 N.E. 2d 658 (1996), the SJC affirmed the enforceability of a settlement agreement between an injured party and an insured which assigned the insured's right against the insurer for indemnification. The SJC noted that the injured party would still have to establish both liability and damages in order to recover against the insurer. The SJC's explanation is instructive:

> It is clear that, had the underlying tort claim been tried, and a judgment entered in excess of the $500,000 coverage afforded by the American policy, O'Donnell's resulting claim against the defendant insurance brokers could have been assigned … Neither the existence of claims against O'Donnell, nor their value, therefore has been established and tested in full adversary proceedings. Nonetheless, we are reluctant to foreclose the possibility of settlement like the one entered into by O'Donnell and the plaintiffs. [Footnote omitted.] See Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 765, 610 N.E. 2d 912 (1993) (acknowledging sensible policy of promoting settlement in appropriate circumstances); Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, 326, 568 N.E. 2d 631 (1991). … We do not ignore the risk that, when a prejudgment settlement is combined with a release and covenant not to execute in favor of the tortfeasor, collusion may exist between the injured party and the tortfeasor. See Glenn v. Fleming, 247 Kan. 296, 318, 799 P.2d (1990) (expressing "concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties"). … [W]e think any risk of collusion can be diminished by requiring the plaintiffs to assume the burden of proof with respect to the claims brought by them, see Id. at 318-319, 799 P.2d 79, citing Griggs v. Bertram, 88 N.J. 347, 367-368, 443 A. 2d 163 (1982), and by recognizing that, unlike an insurance company which has failed to defend its insured, these defendants, who were not parties to the settlement agreement, cannot be bound by its terms insofar as it purports to fix their liability. See Home Indem. Ins. Co. v. Merchants Distribs., Inc., 396 Mass. 103, 104, 106-107, 483 N.E. 2d 1099 (1985) (insurer's settlement agreement which imposes costs on insured is not binding on insured who is not party to agreement and has not had opportunity to litigate disputed point). Further it is open to the defendants to suggest the issue of collusion, and if a satisfactory basis exists, to argue it to the fact finder. … Placing with the plaintiffs the responsibility of proving their assigned claims in full reduces the risk of collusion, and justifies giving effect to the assignment of the negligence claims. We conclude that the plaintiffs' negligence claims should not have been dismissed.

Id. 422 Mass. at 192-93, 661 N.E. 2d at 662-63 (emphasis added). Not only did the SJC affirm the plaintiff's right to bring a negligence claim, it also affirmed the plaintiff's rights to bring a contract claim as third-party beneficiary as well as assignee. Id. 422 Mass. at 194, 661 N.E. 2d at 663-64, & fn. 14.

The cases on which Travelers rely, Defendants Memo at 10, do not help them. The Court in Zurich Am. Ins. v. Lord Elec. Co. of Puerto Rico, 986 F. Supp. 2d 104 (D. P.R. 2013) plainly recognized that a settlement alone could trigger a duty to indemnify. The Court stated that the duty to indemnify, "arises only when the claim against the insured has enough merit to produce a judgment for the claimant, or a settlement." Id. at 116 (emphasis added) quoting Scottsdale Ins. Co. v. Subscription Plus, Inc., 299 F.3d 618, 620 (7th Cir. 2002). In the instant action, the insured, Doe, has settled the claim against him thereby triggering Travelers' duty to indemnify him.

Travelers also relies on Great Am. Ins. Co. v. Riso, Inc., 479 F.3d 158, 160 (1st Cir. 2007) which quotes Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10 (1989). Both cases addressed the issue of a duty of an insurer to defend and, in dicta, they distinguished the duty to defend from the duty to indemnify indicating that the duty to defend arises before judgment enters and the duty to indemnify is thereafter triggered "when a judgment within the policy coverage is rendered by an insured". Neither case addresses the duty to indemnify based on a settlement agreement, which is the situation here. Those cases are therefore inapposite.

2. A Settlement Agreement Need Not Be Reduced To Judgment To Be Enforceable.

Where a contract is entered into, so long as both parties agree to its terms there is no case or controversy to present the court for adjudication and reduction to a judgment. Ferris v.

Monterey Zoning Bd. Of Appeals, 83 Mass. App. Ct. 1112, *2 (2013) citing Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 293 (1977) (a "legally cognizable actual controversy" is required of every lawsuit). There is therefore, no need to reduce a settlement agreement to a judgment for it to be enforceable.

3. Public Policy Favors The Enforcement Of Valid Settlement Agreements.

Travelers urges a result which is squarely against public policy. There is a strong public policy interest in encouraging disputes to be resolved outside of court through the use of settlement agreements, particularly disputes involving insurance. Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 567-68, 750 N.E. 2d 943, 951-52, (2001), quoting Clegg v. Butler, 424 Mass. 413, 419, 676 N.E. 2d 1134, 1139, (1997) ("[G.L. c. 176D was] enacted to encourage the settlement of insurance claims and discourage insurers from forcing claimants into unnecessary litigation to obtain relief. This goal of facilitating settlement is equally desirable whether the plaintiff is an insured or a third-party claimant."). Settlement agreements are essential in reducing the number of cases filed in court annually and enable parties to resolve their disputes privately. See Appellate Tax Bd., The Com. of Massachusetts Exec. Office for Admin. and Fin., Performance Report, Fiscal Year 2014, at 3 (2014) (recent years have produced "record numbers" of cases); Inessa Love, "Settling Out of Court, Viewpoint: Public Policy for Private Sector", Note no. 329 at *1 (World Bank, Oct. 2011) (alternatives to litigation save time). Travelers essentially argues that, prior to triggering an obligation to indemnify, every private settlement agreement for which insurance indemnification is sought would need to be first filed in court and reduced to a judgment. This is antithetical to these public policy goals because it would increase the number of lawsuits and render illusory the privacy provisions contained in many settlement agreements.

For the foregoing reasons, H.S. has viable claims for negligence and breach of contract which should not be dismissed.

**D. TRAVELERS BREACHED THEIR DUTY TO SETTLE BECAUSE THEY HAD AN OBLIGATION TO EFFECTUATE PROMPT SETTLEMENT OF DOE'S CLAIMS INASMUCH AS DOE'S LIABILITY WAS COVERED BY THE POLICY, LIABILITY WAS REASONABLY CLEAR, AND THE CLAIMS WERE NOT SUBJECT TO THE POLICY'S BUSINESS EXCLUSION.**

The Motion should be denied because H.S. has set forth claims against Doe which were covered by the Policy, Ex. A, and liability was reasonably clear, triggering Travelers' obligation to effectuate a prompt settlement. The business exclusion in the Policy, Ex. A, does not apply to H.S.'s claims because the personal relationship between Doe and N.A. was not undertaken by Doe in connection with the practice of law.

1. The Personal Relationship Between Doe And N.A. Was Not Undertaken By Doe In Connection With The Practice Of Law.

The harms complained of in the Complaint do not arise out of or in connection with Doe's law practice. *The Defendants have conceded that this is at least partially true*, and that is enough to defeat their Motion. The Defendants Memo at 11, asserts that H.S.'s claims against Doe are subject "at least in part" to the business exclusion provision of the Policy, Ex. A. This amounts to an admission that the claims are, at least in part, *not* subject to that exclusion. At a minimum, whether an insurer has conducted an adequate investigation before denying a claim, whether liability has become reasonably clear, and whether a settlement offer is reasonable are factual determinations. Bobick v. U.S. Fidelity & Guar. Ins. Co., 57 Mass. App. Ct. 1, *3-*4, 781 N.E. 2d 8, 10 (2003). Therefore, they should not be resolved at the motion to dismiss stage. Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass. App. Ct. 955, 956, 649 N.E. 2d 803 (1995).

Furthermore, the plain language of the Policy, Ex. A, requires coverage because the business exclusion provision is not applicable. That provision states:

> **1. Coverage E – Personal Liability and Coverage F – Medical Payments to Others do not apply to bodily injury or property damage:**
>
> . . .
>
> b. Arising out of or in connection with a **business** engaged in by any **insured**. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstances involving a service or duty rendered, promised, owed or implied to be provided because of the nature of the **business**.
>
> . . .
>
> d. arising out of the rendering or failing to render of professional services;

Id., at 41 (emphasis in original).

A sexual relationship is not part of the practice of law and, in fact, is antithetical to the practice. Even if Doe and N.A. met because he was her lawyer, none of the tortious conduct complained of in this case arose out of or was in connection with the practice of law. As Travelers correctly points out, Doe was N.A.'s attorney and the practice of law undoubtedly qualifies as a "trade, profession, or occupation" within the meaning of professional services. Defendants Memo at 12. Nevertheless, like any other tort not connected with an attorney's representation of a client (e.g., assaulting a client after work, negligently operating a motor vehicle causing harm to a client's property, etc.), a sexual relationship does not constitute conduct "arising out of or in connection with" the practice of law. None of Doe's conduct as alleged in the Complaint was related to his provision of professional legal services. All of the alleged misconduct arose, *a fortiori*, outside of the professional context.

In fact, sexual relationships between an attorney and client involved in divorce proceedings are strictly prohibited. The emotional involvement fostered by a sexual relationship

undercuts the objective detachment required for adequate representation. See e.g., American Bar Association Standing Committee on Ethics and Professional Responsibility. Formal Opinion 92-364; Sexual Relations With Clients ("Opinion") at 1. A sexual relationship between lawyer and client involves unfair exploitation of the lawyer's fiduciary position and significantly impairs the lawyer's ability to represent the client competently, and therefore violates both the Model Rules of Professional Conduct and the Model Code of Professional Responsibility. See ABA Model Rules of Professional Conduct; Rule 1.8: Conflict of Interest: Current Clients: Specific Rules, subrule (j) ("A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced.")

It does not help Travelers to argue that H.S.'s October 2012 Demand Letter, Ex. B, asserts that Doe was engaged in trade or commerce. Defendants Memo, at 11. H.S. concedes that his claim against Doe under G.L. c. 93A fails in this action,[4] which addresses H.S.'s claims against Doe acting personally and not professionally.

Therefore, the personal relationship between Doe and N.A. was not undertaken in connection with the practice of law and the business exception in the Policy, Ex. A, is no bar to recovery.

2. H.S. Has Asserted A Claim Against Doe In Doe's Individual Capacity For Which Liability Was Reasonably Clear.

This is not a case about lying in the dating process as alleged by Travelers, Defendants Memo at 13-14.[5] Rather, it is a case where one person has injected himself into a position of trust and aid for a known vulnerable person which created a duty of care and caused the

[4] This concession is limited solely to H.S.'s c 93A claim against Doe and does not apply to H.S.'s c. 93A claim against Travelers for unfair claim settlement practices. See p. 22, infra.
[5] Massachusetts law is clear that there is no general duty of honesty in dating. Conley v. Romeri, 60 Mass. App. Ct. 799, 801, 806 N.E. 2d 933, 936 (2004).

vulnerable person to abandon other avenues of support. Facts, above at 2-4. That duty was breached when Doe withdrew his aid with reckless disregard for the foreseeable consequences.

The facts set forth in the Complaint make clear that Doe was very well aware that N.A. suffered from severe depression and anxiety, had suicidal tendencies and was in need of medical and psychological care and treatment. Id., par. 10. He knew she had recently been hospitalized for a suicide attempt. Doe knew or should have known that without proper medical and psychological care and treatment, N.A.'s condition would not improve and could continue to deteriorate. Id., par. 11-14. Doe exacerbated N.A.'s depression, suffering and suicidal ideations, and knew or should have known that his conduct was causing N.A. severe emotional distress. Id., par. 15-21. N.A.'s suicide note is addressed to Doe and states, "[w]here were you [John Doe], you said you'd come, even if it was 3 am – it's so hard for me not to conclude – I just didn't matter enough to anyone – how pathetic." Id., par. 22. Combining this evidence of a duty which was breached with the surrounding facts and circumstances makes clear that Doe's conduct substantially contributed to and was a substantial factor in N.A.'s suicide. At a minimum these are questions of fact which entitle H.S. to a trial. See Argument A, above at 7.

Doe, with full knowledge of N.A.'s suicide ideation and actual suicide attempts, interjected himself as N.A.'s protector and knowingly supplanted H.S. and her Son as her sources of support. This created a special relationship of control by Doe and dependence by N.A. on Doe. He therefore had a duty to exercise reasonable care to ensure that she did not hurt or kill herself. He knew or should have known that his repeated abandonment and reconciliation with N.A. created an unreasonable risk that she would hurt or kill herself, which she did. He breached his duty by failing to exercise reasonable care to prevent that risk, causing her serious harm.

This is sufficient to establish a viable claim for negligence. Prosser and Keeton § 56, at 375-77 ("Even when no 'special relationship' originally existed, a duty may arise when a defendant interjects himself or herself into a situation and creates a special relationship of control"). The Restatement (Second) of Torts, § 321 (1965), updated October, 2014 ("Restatement") similarly provides:

> (1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect. (2) The rule stated in Subsection (1) applies even though at the time of the act the actor has no reason to believe that it will involve such a risk.

Doe took charge of N.A., who was unable to adequately aid or protect herself, and supplanted himself in place of her other sources of love and support, e.g., H.S. and her Son. Doe then discontinued his aid and protection without securing her safety, and left her in a worse position than when he took charge of her. By his affirmative actions, Doe created an unreasonable risk of physical harm to N.A. and therefore he had a duty to exercise reasonable care to prevent that risk of harm. Restatement, §324 ("One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him."). "In general, courts will find a duty where reasonable persons would recognize it and agree that it exists." Tallariti v. Kildare, 63 Wn. App. 453, 456, 820 P.2d 952, 953 (1991) (citing Prosser and Keeton § 53, at 359).

The Restatement, §323 also provides authority for finding a duty on the part of Doe, and liability for his subsequent breach thereof:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Accord Jain v. State, 617 N.W. 2d 293, 297-300 (Iowa 2000) (court suggested that if a defendant's conduct increased risk of victim's suicide and/or led victim to abandon other avenues of relief from distress, defendant may be liable under §323 theory). Where a person's actions and assistance put another person in a "worse position than [she] was in before, either because the actual danger of harm [] has been increased by the partial performance, or because [she], in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor is not free to discontinue his services where a reasonable man would not do so." Restatement, §323, comment (c).

A "special relationship" may arise where, as here, the defendant creates or increases the risk of injury to the plaintiff, or creates a dependent relationship, which induces reliance or prevents assistance from others. People v. Oliver, 210 Cal. App. 3d 138, 258 Cal. Rptr. 138, 143 (1989); Clemente v. State of California, 40 Cal. 3d 202, 212-213, 219 Cal. Rptr. 445, 450-451, 707 P.2d 818, 823 (1985); Johnson v. State of California, 69 Cal. 2d 782, 73 Cal. Rptr. 240 (1968); Carlisle v. Kanaywer, 24 Cal. App. 3d 587, 592, 101 Cal. Rptr. 246 (1972). In Oliver, the court found liability for criminal negligence when the defendant took an extremely intoxicated man to her house, allowed him to use heroin, found him unconscious, dragged him behind her house where he could not be aided by others, and failed to summon aid. Oliver, 210 Cal. App. 3d at 144, 258 Cal. Rptr. at 144. The court found that the defendant was liable for the death, in part, because she took charge of a person unable to prevent harm to himself, creating a duty. Id. at 149.

As the facts in the Complaint make clear, it is difficult to conceive of a more vulnerable position than the one in which Doe put N.A. Her suicide was eminently foreseeable to Doe, and he injected himself into her life as her protector figure. N.A.'s suicide is not an intervening or superseding cause which exonerates Doe. Where suicide was a "foreseeable consequence" of negligence, the suicide may not be an independent intervening cause between an anterior act of negligence and death. Carney v. Tranfaglia, 57 Mass. App. Ct. 664, 669-670, 785 N.E. 2d 421, 425 (2003). In addition, there can be no comparative negligence on the part of a person who commits suicide where the defendant's duty of care includes preventing the self-abusive or self-destructive acts that caused the plaintiff's injury. McNamara v. Honeyman, 406 Mass. 43, 55, 546 N.E. 2d 139, 146 (1989). Negligent tortfeasors may be held liable for the suicide of persons who, as a result of their negligence, suffer mental disturbance destroying the will to survive, if the suicide is "a foreseeable risk associated with the alleged wrongful acts of the defendants." D'Addezio v. Agway Petroleum Corp., 186 A.D. 2d 929, 931, 589 N.Y.S. 2d 206 (1992).

Here, it was eminently foreseeable to Doe that N.A.'s precarious emotional and psychological state, his self-imposed role as her protector and his repeated abandonment would cause her to again attempt suicide. Where negligence "substantially contributed" to suicide, that negligence becomes the proximate cause of the suicide. Koren v. Weihs, 201 A.D. 2d 268, 269, 607 N.Y.S. 2d 257, 257 (1994) ("Because defendant had been decedent's psychiatrist and possessed detailed knowledge of her history, it cannot be said that the risk of decedent's suicide as a consequence of defendant's alleged sexual relationship with her was attenuated or unforeseeable. The presence of other stressful factors in decedent's life does not displace defendant's alleged acts as a proximate cause of the suicide, since it is necessary only that they 'substantially contributed' to the death.").

3. Travelers Breached Their Duty To Settle.

Because H.S.'s claims were covered by the Policy, Ex. A, and not excluded and because Doe's liability was reasonably clear, Travelers had a duty to settle under G.L. 176D and their failure and refusal to settle gives rise to a claim under G.L. c. 93A which should not be dismissed. Liability arises under G.L. c. 176D, sec. 9(e) where an insurer fails, "to effectuate, prompt, fair and equitable settlements of claims in which liability has become reasonably clear." G.L. c. 93A, sec. 9 provides a right of action for violation of this statute. Guity v. Commerce Ins. Co., 36 Mass. App. Ct. 339, 343-44, 631 N.E. 2d 75, 77-78 (1994).

H.S. also stated facts against Doe which give rise to claims for negligence and negligent infliction of emotional distress.[6] These were both covered claims under the Policy[7], and liability was reasonably clear, triggering Travelers' duty to make a prompt, fair and reasonable settlement of those claims as well. Nevertheless, Travelers did nothing. Travelers also failed to seek a judicial declaration as to their rights and obligations, which can demonstrate an insurer's good faith in defending against a multiple damage claim under c. 176D and c. 93A. Premier Ins. Co. of Massachusetts v. Furtado, 428 Mass. 507, 510, 703 N.E. 2d 208, 210 (1998).

For the foregoing reasons, the personal relationship between Doe and N.A. was not subject to the business exclusion in the Policy, Ex. A, and, because Doe's liability was reasonably clear, Travelers breached their duty to effectuate a prompt settlement. H.S.'s claims against Travelers should therefore not be dismissed.

---

[6] To recover for the tort of negligent infliction of emotional distress, a plaintiff must prove: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Payton v. Abbott Labs, 386 Mass. 540, 557, 437 N.E. 2d 171, 181 (1982).

[7] The Policy, Ex. A, Section II Liability Coverages, Coverage E – PERSONAL LIABILITY provides for coverage. See fn. 2, at 8, above. There is an exclusion for bodily injuries which are "expected or intended" by the insured, id., Section II – EXCLUSIONS, (1)(a.), however there is no exclusion for claims sounding in negligence or negligent infliction of emotional distress. Id., Section II – EXCLUSIONS.

## E. SHOULD THE COURT FIND A DEFECT IN THE PLEADINGS, H.S. SHOULD BE PERMITTED AN OPPORTUNITY TO CURE.

Should the Court find that H.S. has failed to properly plead his claims, then he respectfully requests an opportunity to cure by amending his Complaint. Amendments should be freely permitted to cure pleading deficiencies. Boston & Main Corp. v. Town of Hampton, 987 F.2d 855, 865 (1st Cir. 1993).

## CONCLUSION

For the foregoing reasons, the Motion should be denied. In the alternative, the Court should grant H.S. leave to file an amended complaint to cure any pleading deficiencies.

Respectfully submitted,
H.S., Executor of the Estate of N.A. and
Assignee of JOHN DOE
By his attorneys,
COHAN RASNICK MYERSON PLAUT LLP

Robert D. Cohan, BBO: #088300
Jonathan D. Plaut, BBO: #638344
One State Street, Suite 1200
Boston, MA 02109
(617) 742-1820

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by hand/mail/email on 1/14/2015