# EXHIBIT C

**COHAN RASNICK MYERSON PLAUT LLP**
One State Street, Suite 1200
Boston, Massachusetts 02109
(617) 742-1820
Telecopier (617) 227-1780

Jonathan D. Plaut, Esq.

September 19, 2013

VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND FIRST CLASS MAIL

Travelers
Attn: Naomi D. Souliere, Specialist
New England Claim Center
44 Bedford Street
P.O. Box 1450
Middleboro, MA 02344
nsoulier@travelers.com

Re: Estate of Nancy Andersen v. [redacted] A. [redacted] and [redacted]

Demand for Relief Pursuant to G.L. c. 93A, sec. 9

Dear Ms. Souliere:

As you are aware, this firm represents Harry Sanders individually and as executor of the Estate of Mr. Sanders' late wife, Nancy A. Andersen ("Andersen"), and Mr. Sanders' minor son, Kenneth Sanders ("Kenneth").

This letter, including the enclosures, constitutes a demand for relief to Travelers ("Travelers") on behalf of our clients pursuant to G.L. c. 93A, §9. This letter also supplements our 93A demand letter dated October 15, 2012, to [redacted] A. [redacted] (" [redacted] and [redacted] (the "Firm"), and our letter to Attorney [redacted] dated December 5, 2012, which are attached hereto as Exhibits A and B, respectively, and incorporated herein by reference. Reference is also made herein to a certain Travelers Homeowners Policy underwritten by The Phoenix Insurance Company bearing the Policy Number 975444446-633-1 (the "Policy"). Reference is also made to Ms. Souliere's letter to Attorney [redacted] dated September 11, 2013 declining coverage under the Policy regarding the demand and claim made by our clients against [redacted] and the Firm (the "Denial Letter").

Our clients' claims are covered claims under the Policy. The Policy, Section II(E) provides for personal liability coverage (including bodily injury and property damage) up to $500,000. Id., Continuation Declarations, page 1 of 3. The Homeowners Policy Booklet from

Travelers which is part of the Policy (hereinafter, "Booklet"). Section II Liability Coverages, Coverage E – PERSONAL LIABILITY provides:

> If a claim is made or a suit is brought against any **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, even if the claim or suit is false, we will:
>
> a. Pay up to our limit of liability for the damages for which the **insured** is legally liable. Damages including prejudgment interest awarded against the **insured**; and
>
> b. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the occurrence equals our limit of liability.

Id. The term "occurrence" is defined in the Booklet as:

> an accident, including continuous or repeated exposure to substantially the same generally harmful conditions which results, during the policy period, in:
>
> a. **bodily injury**; or
>
> b. **property damage**.

Id., Definitions, par. 6.

In the Denial Letter, Travelers denies coverage on the following grounds:

> It is our position that the damages claimed by the Estate of Nancy Anderson [sic], while they may constitute damages because of "bodily injury" as that term is defined in the policy, the suicide committed by Nancy Andersen does not constitute an "occurrence" as defined as it was not accidental in nature.

Id., p. 2.

Travelers' position in this regard is inaccurate. It has never been asserted by this firm or our clients that the death of Ms. Andersen was intended by [redacted] Therefore, it constitutes an "occurrence" under the Policy, and coverage therefore exists under the Policy.

Travelers also has denied coverage on the following grounds:

> As the damages claimed are alleged to have arisen out of the rendering or failure to render professional legal services by [redacted] in his business role as attorney for Nancy Anderson [sic], exclusion "b." and/or exclusion "c." would apply to preclude coverage.

Denial Letter, p. 2.

[redacted] and the Firm have taken the position that the wrongdoing [redacted] did not arise out of the rendering or failure to render professional legal services by [redacted] If true, this exclusion would not apply.

Attached hereto as Exhibit C and incorporated herein by reference is a letter from Renee Sorrentino, MD dated June 7, 2013, wherein she provides her expert opinion that the relationship between [redacted] and Andersen was a substantial contributing factor in her suicide, and that [redacted] knew or should have known that Andersen was at risk of suicide. We have provided [redacted] and the Firm with substantial supporting documentation including medical records, emails, pleadings in the divorce action, police reports and Andersen's personal diaries. They are available to you as well upon request.

Demand for settlement is hereby made against Travelers in the amount of the Policy limit, $500,000, to compensate Andersen's estate for the negligence [redacted] Liability, damages and causation are all reasonably clear, triggering prompt, fair, and equitable settlement by Travelers. This demand should be met because it is reasonable. Andersen died as a result of the negligence of Travelers' insured. Kenneth had the right to the love, guidance, affection, consortium and financial support from his mother which has been taken away from him. Mr. Sanders, in turn, had the right to the chance for reconciliation and the right to the consortium, love, affection and financial support she would have furnished to Kenneth. Should Travelers fail to make this settlement, our clients reserve the right to bring claims against [redacted] sounding in other torts and under statutes including but not limited to G.L. c. 93A and the Massachusetts Wrongful Death Statute, G.L. c. 229. Should this occur, we would seek, *inter alia*, the fair monetary value of the decedent including but not limited to compensation for the loss of the reasonably expected net income, services, protection, case, assistance, society, companionship, comfort, guidance, counsel and advice of Ms. Andersen, her reasonable funeral and burial expenses, and punitive and multiple damages. This demand is for settlement purposes only and does not in any way limit our client's right to claim and establish higher damages at trial.

Because liability, damages and causation are all reasonably clear, Travelers should tender

and offer the full amount of the Policy to discharge its liability under G.L. c. 176D, without limitation on our client's rights to pursue additional damages from [redacted] If this demand is not met we will file suit against Travelers pursuant to G.L. c. 93A and G.L. c. 176D for its failure to effectuate prompt, fair and equitable settlement of claims in which liability has become reasonably clear. Under these statutes, Travelers may be held liable for up to three times the actual damages sustained plus reasonable attorney's fees and costs incurred. See G.L. c. 93A, § 9(4).

Pursuant to G.L. c. 93A, sec. 9, please tender your response within the next thirty (30) days.

You should also note that the parties have agreed to mediate this dispute before Brad Honoroff on September 30, 2013. I urge you to participate.

Sincerely,

Jonathan D. Plaut

JDP/nfs
Enclosures
cc: (cover letter only)
David Grossbaum, Esq.
[redacted]
Robert D. Cohan, Esq.

# EXHIBIT A

**COHAN RASNICK MYERSON LLP**
One State Street, Suite 1200
Boston, Massachusetts 02109
Tel: (617) 742-1820
Fax: (617) 227-1780
rcohan@crmllp.com

Robert D. Cohan, Esq., P.C.

October 15, 2012

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

[redacted]

[redacted]

Re: Demand For Relief Pursuant to G.L. c. 93A § 9

Dear Attorney [redacted]

This firm, in association with Chardon Law Offices, represents Harry Sanders individually and as executor of the Estate of Mr. Sanders' late wife, Nancy A. Andersen ("Andersen"), and Mr. Sanders' minor son, Kenneth Sanders ("Kenneth"). This letter is a demand for relief on behalf of our clients pursuant to G.L. c. 93A, § 9.

You are engaged in trade and commerce as such terms are defined in G.L. c. 93A, § 1(b); and the transactions complained of herein constitute consumer transactions within the meaning of the above referenced statute. Ms. Andersen was your client and therefore a consumer within the meaning of the statute. The facts set forth below are the basis of this demand.

Mr. Sanders and Ms. Andersen were married on or about August 27, 1994. After a long-term marriage of over 16 years, Ms. Andersen hired [redacted] ("[redacted] to represent her in a divorce action. On or about April 11, 2011, [redacted] and his law firm, [redacted] (the "Firm") entered into a written fee agreement with Ms. Andersen, and she paid a $7,500 retainer. We understand that at that time [redacted]

held himself out not only as a capable divorce attorney but also as a licensed social worker. [redacted] and the Firm filed for divorce on her behalf on or about May 4, 2011, although at the outset of the representation Ms. Andersen expressed an interest in reconciling with her husband.

At or near the inception of the representation, [redacted] learned that Ms. Andersen suffered from severe depression, had suicidal tendencies and was in need of medical and psychological care and treatment for those conditions. [redacted] knew that Ms. Andersen had been prescribed anti-depressant medications and other medications and had attempted suicide on several occasions. [redacted] knew or should have known that the marital difficulties which led up to the divorce filing were exacerbating her medical and psychological conditions and causing her to be increasingly depressed and suicidal. [redacted] knew or should have known that, with proper medical and psychological care and treatment, her condition would improve and her marital difficulties might subside, making divorce unnecessary.

Nevertheless, with full knowledge of Ms. Andersen's condition and her interest in reconciling, [redacted] entered into a sexual relationship with her, exploiting her infirmities and jeopardizing [redacted] ability to represent her impartially. After commencing that relationship [redacted] did not withdraw as her lawyer. Her interest in mending the marital relationship and keeping her family intact predictably waned.

After engaging in this sexual and dating relationship for several months, [redacted] exacerbated her already fragile psychological state through a series of break-ups and reunions. [redacted] finally terminated the relationship with utter disregard for her condition and the reasonably foreseeable consequences of his actions. She committed suicide on or about October 2, 2011. The cause of death as noted on the Certificate of Death was "ethanol abuse". Ms. Andersen's suicide note, addressed to [redacted] states in part, "where were you [redacted] you said you'd come, even if it was 3am"; and "wish you were here [redacted]...". [redacted] course of conduct was plainly a significant factor in and the precipitating cause of Ms. Andersen's death.

In our opinion, this misconduct was unethical, in breach of your fiduciary duty, and grossly negligent. The failures, acts and omissions set forth herein also constitute unfair and/or deceptive business practices within the meaning of G.L. c. 93A, § 2(a). Commencing an intimate relationship with a client in these circumstances violated Mass. R. Prof. C. Rule 1.7(b), and the American Bar Association Model Rules of Professional Conduct, Rule 1.7(a). See Case of Bourdon, 132 N.H. 365, 372 (1989) (intimate relationship between attorney and client is a *per se* violation of Professional Conduct Rule 1.7). Particularly in the divorce law context, sex between the attorney and client is an obvious breach of the duty of loyalty, a conflict of interest, and an unfair and deceptive business practice. See Matter of Lewis, 262 Ga. 37, 38 (1992) ("[e]very lawyer must know that an extramarital relationship can jeopardize every aspect of a

client's matrimonial case"); Matter of DeSandro, 680 A.2d 73, 75 (R.I. 1996) (sexual relationship between an attorney and client in a divorce case creates an "inherent conflict" between the client's interests and the attorney's personal agenda).

In view of the above, and the fact that Ms. Andersen was 48 years old at the time of her death, earning about $180,000 with benefits at the Mass. Housing Finance Agency, demand for settlement is hereby made in the amount of $9,000,000 to compensate our clients for their damages under the Massachusetts Wrongful Death Statute, G.L. c. 229, sec. 2, for conscious pain and suffering, and for the unfair and deceptive practices alleged above. This demand is for settlement purposes only and does not in any way limit our clients' right to claim greater damages at trial.

You have rights and obligations in conjunction with this demand letter set forth in G.L. c. 93A, § 9(3). If it is determined in a court of law that your conduct was a willful and/or knowing violation of G.L. c. 93A § 2, or that your refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the acts or practices complained of violated Section 2, you may be held liable for up to three times our clients' actual damages sustained as a result thereof. If it is determined that you have violated G.L. c. 93A § 2, the court shall award, in addition to other relief, reasonable attorney's fees and costs incurred. See G.L. c. 93A, § 9(4).

If you have insurance which may be available to defend or indemnify you, you should place your carrier on notice of this claim immediately. Failure to do so could result in the loss of coverage.

Sincerely,

Robert D. Cohan

RDC/ams

cc: Jonathan D. Plaut, Esq.

**EXHIBIT B**

**COHAN RASNICK MYERSON LLP**
One State Street, Suite 1200
Boston, Massachusetts 02109
Tel: (617) 742-1820
Fax: (617) 227-1780
rcohan@crmllp.com

Robert D. Cohan, Esq., P.C.

December 5, 2012

[redacted]

Re: Estate of Nancy Andersen v. [redacted] A. [redacted] and [redacted]
**FOR SETTLEMENT PURPOSES ONLY**

Dear Attorney [redacted]

We write today in furtherance of our settlement discussions. The facts and analysis set forth herein are for settlement purposes only and may only be used for that purpose.

Your client, [redacted] A. [redacted] ("[redacted] and his firm, [redacted] (the "Firm"), are liable for negligence in representing Nancy Andersen ("Andersen") in divorce proceedings. His negligence was the proximate cause of her suicide. His dual roles as lover and lawyer pitted his personal interests against his fiduciary obligations to render honest advice to her and advance her stated goals of attempting to reconcile with her husband, Harry Sanders ("Sanders"). Andersen's journal entries leading up to her death make clear that as the case progressed, [redacted] repeatedly drew her in and then pushed her away, toying with her affections, causing her increased confusion, depression and desperation, culminating in his final break and her suicide. The suicide was eminently foreseeable to [redacted] because he knew of her long history of suicidal ideation and attempts – including a previous suicide attempt and hospitalization earlier during his representation of her. He nonetheless pressed on as both her lawyer and her lover.

**Facts**

Sanders and Andersen were married August 27, 1994, in Winnetka, Illinois and later moved to Newton, Massachusetts. After a long-term marriage of over 16 years, Andersen hired

to represent her in her divorce action. On April 11, 2011, Anderson entered a fee agreement with the Firm. [redacted] filed for divorce on her behalf on or about May 4, 2011. The pleadings filed in the divorce were filed under the Firm name. Had he been acting on his own and not as part of the Firm, he would have used his own stationery, not the Firm's, and he would not have identified the Firm in pleadings. [redacted] and the Firm continued to represent her up to and including the date of her death.

Andersen suffered from depression and had multiple prescriptions for anti-depressant medications. In the year leading up to her death she had been prescribed at least the following medications: IC Propranolol (10MG), Zomig (5MG), IC Prednisone (10MG), Seroquel (25MG), IC Amlodipine (5MG), Campral (333MG), IC Amoxicillin (500MG), IC Alprazolam (.5MG), IC Butal-ASA-CAFF, IC Amitriptyline (25MG), and IC Doxycycline (50MG). She had a history of two attempted suicides and suicidal ideation. She had a benzodiazepine overdose in 2008 and was placed in an intensive care inpatient unit at Brookhaven Hospital in Seymour, Tennessee. On April 6, 2011 she took an overdose of Alprazolam, Seroquel, and Butalbital and was hospitalized in Massachusetts.

Attorney [redacted] was well aware of Andersen's depression, multiple anti-depressant medications, history of suicide attempts and suicidal ideations. He knew of her precarious and fragile psychological state and her need for continued and intensive psychological care and treatment. told police at the scene of Anderson's death that he had knowledge of her previous suicide attempts. In fact, Andersen's suicide attempt on April 6, 2011, immediately followed a conversation she had with [redacted] and it was [redacted] himself who called for an ambulance. After Andersen was hospitalized, [redacted] phoned her sisters. He told them that Andersen was hospitalized for a suicide attempt and that they should fly out to see her. He was afraid that she was going to kill herself. He also prepared an affidavit for Andersen to sign which was filed on or about August 10, 2011, in which Andersen attests to a six month period of major depression from November, 2007, to April, 2008. knew that Andersen had several voluntary and involuntary psychiatric hospitalizations.

At the inception of the representation, and even after the divorce was filed, Andersen made clear to [redacted] her desire to reconcile with her husband. In fact, during one of the first court appearances in the case [redacted] talked to Sanders about the fact that Andersen wanted to reconcile, and he offered Sanders the contact information of a colleague who specialized in assisting couples in reconciling. [redacted] knew that the marital difficulties which led up to the divorce filing were exacerbating Andersen's medical and psychological conditions and causing her to be increasingly depressed and suicidal. His marching orders to promote a reconciliation were clear.

Notwithstanding his knowledge of all of the foregoing, including Andersen's express desire to save her marriage, [redacted] commenced a sexual relationship with her. [redacted] should have then immediately withdrawn from representing her, but he did not. He also failed to advise Andersen to replace him as counsel. He continued the affair and continued to represent her in breach of his duty to her.

The evidence of a sexual relationship between [redacted] and Andersen is beyond dispute. She told her sisters that she was sleeping with He visited her apartment late at night, well past typical attorney-client meeting hours. During the course of the representation Anderson wrote:

> I like the way you...
>
> Share so openly and lovingly the things that touch you – music, books, movies, art – and seem equally open to receiving the same, even if that particular song's not just quite your taste, or what you had in mind for the moment.
>
> Smile, your eyes warm and sparkling, crinkled at the edges, drawing me into you with your gentle warmth, your glow.
>
> Run your arm, hand, fingertips across my cheek, my neck, my collar, breast, belly and beyond...
>
> Hold me, hold me with those strong, broad arms of yours, so close against your lovely, wonderfully hairy chest.
>
> Know just when to speak, and when to say nothing at all.
>
> [redacted] sweet [redacted]

[redacted] and Andersen also stayed at a hotel together. They went to his daughter's school graduation ceremony in California together. Anderson also made multiple late night visits to [redacted] home, and Fastlane receipts confirm this. Andersen's diary entries reflect the dates and times of their nighttime meetings. She wanted to be known as a couple among her friends. Andersen's son, Kenny, reports that [redacted] kissed Andersen on the mouth in front of him and that [redacted] was very affectionate to her and "hands-on". She repeatedly told her friends and family members that she was having an affair with [redacted] and that she was

sleeping with him. After she died, [redacted] shoes, plane ticket and personal notes between [redacted] and his daughter were found in Andersen's suitcase by one of Andersen's sisters, who mailed them back to [redacted] after the funeral.

The sexual relationship dissuaded Andersen from reconciling. At best, it left her hopelessly confused. At several points during the course [redacted] representation, she told her sisters that she had an interest in trying to reconcile with Sanders. At other points in the representation, Andersen professed to her sisters her love for and that she was no longer interested in reconciling with Sanders. Andersen's physician's notes dated May 31, 2011, indicate: "At her last visit note was made that she did not look well i.e. seems to have lost weight and appears tense and frazzled. She looks the same today... Her divorce lawyer will hopefully bring all of this to closure, sooner rather than later, since that seems essential to diminishing the stress."

The longer the case and the sexual relationship progressed, the more infatuated Andersen became with [redacted] Andersen wrote:

> [D]o you not – you must – know how I long for you, how I crave the warmth of your arms around me. How insatiable is my desire that right now, my belly full with fair-to-middling hospital food, I yet rustle thru the bag of goodies you brought, & eat the sweetest among them, hoping to sate in some little way this tremendous desire for you. "You are immensely likeable", I think I said. "you are great therapy for the soul." It must be so obvious, [redacted] how smitten I am.

[redacted] then broke off the affair. This rejection exacerbated Andersen's depression, suffering and suicidal thoughts. Then, on one or several occasions, he drew her back emotionally into an intimate relationship, then cooled and withdrew his affections again, further exacerbating her depression and suicidal thoughts. She wrote about how she was initially drawn in by [redacted] affection for her, and then how she suffered great heartache and loneliness when he repeatedly pulled back. On August 14, 2011, she wrote:

> [redacted] – ...I love you, don't you realize that? and isn't it pretty obvious my heart can't take one more break – isn't it obvious?

On September 8, 2011, she wrote:

> [redacted] why, why, why? So stupid, so foolish, so dangerous a game – why, [redacted] I'm trying to pull away, yet the more I try, the more you pull me back – I'm so ambivalent.

Why? Is it that you think you can save me? Are you feeding your own ego? Why?

As a rubber band – I will stretch, stretch, & then break. Hopefully break from you altogether, lawyer, lover – better than breaking in the alternative.

God, how can you possibly think this is good for me, other than my own pitiful insatiable need for someone, long last, to care for me – and when it's over, well, I fear, it's really over. Because, don't you see, it's all the same, so consistent, you're abandoning me just like all the rest.

So don't, dear sir, don't ever make a promise – no matter how implicit – that you can't keep. Think twice, please. Think twice.

Then, on or about October 1, 2011, after promising that he would come to her apartment, he did not appear and did not call her, at which point Andersen took her own life by drinking herself to death. Her suicide note is addressed to [redacted]

Where were you [redacted] you said you'd come, even if it was 3 am – it's so hard for me not to conclude – I just didn't matter enough to anyone – how pathetic.

## ANALYSIS

[redacted] owed "unflinching fidelity" to advance Andersen's genuine interests. Bermand v. Coakley, 243 Mass. 348, 354 (1923). [redacted] roles as lover and lawyer were conflicting because the emotional involvement that was fostered by the sexual relationship undercut the objective detachment required for adequate representation. See American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 92-364; Sexual Relations With Clients ("Opinion"), at 1. A sexual relationship between lawyer and client in these circumstances involves unfair exploitation of the lawyer's fiduciary position and significantly impairs the lawyer's ability to represent the client competently, and therefore violates both the Model Rules of Professional Conduct and the Model Code of Professional Responsibility. See also ABA Model Rules of Professional Conduct: Rule 1.8: Conflict of Interest: Current Clients: Specific Rules, subrule (j) ("A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced.")

The attorney-client relationship is a fiduciary one in which the client places his or her trust and confidence in the lawyer in return for the lawyer's undertaking to place the interest of

the client ahead of any self-interest of the lawyer. Stockton v. Ford, 52 U.S. (11. How) 232, 247 (1850). This fiduciary relationship imposes the highest standards of ethical conduct on the lawyer. [redacted] sexual relationship with Andersen resulted from exploitation of his dominant position and influence, and constituted a breach of his fiduciary obligations to Andersen. See Opinion, at 1-2.

For many months, put his own sexual gratification above his fiduciary duties to Andersen to act in her best interests. [redacted] professional negligence caused Andersen harm for eight reasons:

(1) [redacted] utterly failed to advance the clearly articulated wishes of his client – a very emotionally fragile woman on the brink of suicide – to effect a reconciliation with her husband and save her long-term marriage and family. [redacted] took away from her the lifeline to her husband and supplanted himself as her singular love interest, rendering the possibility of reconciliation all the more remote. His sexual relationship with her in the first instance – and then continuing the affair while still representing her – was in direct contravention of her express instructions to effect a reconciliation.

(2) [redacted] failed to withdraw as counsel after he initiated their affair preventing her from obtaining the detached advice she needed and was entitled to receive. [redacted] was unable to provide Andersen detached legal advice because his own sexual interests inherently biased his advice. conduct deprived Andersen of independent legal judgment. Emotional detachment is essential to the lawyer's ability to render competent legal services. One of the most important aspects of the attorney-client relationship is the attorney's duty to exercise independent professional judgment. DR 5-107; Opinion, at 4. It was impossible for [redacted] to separate sound judgment from the emotional bias that resulted from his sexual relationship with Andersen. A lawyer involved in a sexual and emotional relationship with a client may encounter particular difficulty in providing the straightforward advice which often involves unpleasant facts and alternatives that a client may be disinclined to confront. Because of a desire to preserve the relationship, the lawyer may be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client. Opinion, at 4. That is precisely what happened here.

(3) [redacted] was inherently conflicted in his representation of Andersen. "It cannot be proper for a lawyer to represent a client when the lawyer's own interest may tempt him to temper his efforts to promote to the utmost his client's interest." ABA Comm. on Professional Ethics and Grievances, Formal Op. 132 (1935). Certainly, interest in preserving the sexual relationship rose to this level. rendered it impossible for Andersen to receive

proper, detached and balanced legal advice from him because her initial instructions regarding reconciliation became hopelessly blurred by their sexual relationship and his self-serving advice not to reconcile. Thus, given the circumstances of this case, [redacted] continued representation of Andersen after he started to sleep with her was continuing and *per se* legal malpractice.

(4) "A related danger resulting from the blurring of relationships and one where the lover becomes a participant adverse to the client is presented in divorce cases where the attorney engaging in a sexual relationship with a client may risk becoming an adverse witness to the client on issues of adultery and child custody." Opinion, at 5; see Model Rule 3.7, which requires that a lawyer terminate representation if he/she is likely to be called as a witness against the client. [redacted] sexual conduct rendered him a witness against his own client.

(5) actions hurt Andersen's chances of a speedy reconciliation. This prolonged the divorce action and promoted the filing of aggressive and decidedly non-reconciliatory affidavits by both sides, causing further animosity between the parties [redacted] participated in fostering the animosity between the parties to promote his own sexual agenda, contrary to Andersen's initial stated interest in reconciliation.

(6) [redacted] used Anderson's trust to her own disadvantage. He used his position of trust and confidence over Andersen, a particularly psychologically troubled and compromised client, to lure her into an affair with him. By "gratifying his own sexual desires with [Andersen] while handling her divorce action, defendant created an inherent conflict with his obligation to represent the client properly." In Re DiSandro, 680 A.2d 73, 75 (R.I. 1996); Vallinoto v. DiSandro, 688 A.2d 830, 846 (1997). A "client who is damaged monetarily, physically, or emotionally by the attorney's breach of his or her fiduciary duties through sexual exploitation of the client should be able to recover for legal malpractice regardless of whether the attorney's legal efforts were performed well and successfully." Id., at 847 (emphasis added).

(7) [redacted] jeopardized her case both in the pending *Guardian Ad Litem* proceedings and in the case-in-chief. [redacted] introduction of sex into the attorney-client relationship rendered a vast amount of his communications with Andersen not privileged. Client confidences are protected by privilege only when they are imparted in the context of the attorney-client relationship. Other than husband and wife, there is no privilege between lovers. See In re Marriage of Kantar, 581 N.E.2d 6, 14 (Ill. App. 1991); C. Wolfram, Modern Legal Ethics, 252 (1986) ("[e]ven if the confidential relationship of lawyer and client is indisputably formed, it does not follow that every communication between them will be privileged. Some communications may have nothing to do with the lawyer's legal services.") [redacted] could

have been called by Sanders as a witness in the *Guardian Ad Litem* proceedings and the case-in – chief for a host of purposes, including to establish adultery, to adduced the conduct of the parties during the marriage, to help the court determine the best interests for Kenneth regarding guardianship and parenting issues, and many other issues which are within the purview of the Probate Court pursuant to G.L. c. 208, §34.

(8) Even [redacted] handling of Andersen's divorce case was otherwise competent, and even if Sanders never called [redacted] as a witness, Andersen still suffered emotionally and psychologically as a result of his breach of fiduciary duty. "[M]erely because plaintiff received a satisfactory pecuniary result in her underlying divorce action does not mean that but for defendant's outrageous sexual misconduct, a better or quicker pecuniary settlement could not have been obtained for her without plaintiff having to become the attorney's concubine for the extended length of her divorce proceedings. Nor does a satisfactory pecuniary settlement mean that plaintiff is precluded from recovering damages for her physical and mental suffering sustained as a direct result of defendant's breach of his fiduciary obligations." Vallinoto, 688 A.2d at 850. An attorney who is negligent, "is liable to his client for any reasonably foreseeable loss caused by his negligence." Fishman v. Brooks, 396 Mass. 643, 646 (1986). This clearly includes psychological and emotional harms.

In light of Andersen's severe psychological issues, [redacted] had a heightened obligation not to take advantage of her. [redacted] knew Andersen's history, knew that she was particularly vulnerable and in an extremely precarious psychological state. Any mental or physical condition of a client that renders her incapable of making a considered judgment in her own behalf casts additional responsibility upon the lawyer. EC 7-12; Opinion, at 3, n.7. Thus, the more vulnerable the client, the heavier the lawyer's obligation to avoid engaging in any relationship other than that of attorney-client. "If the lawyer permits the otherwise benign and even recommended client reliance and trust to become the catalyst for a sexual relationship with a client, the lawyer may violate one of the most basic ethical obligations, i.e., not to use the trust of the client to the client's disadvantage." Galbraith v. Elder, 8 Watts, (Pa.) 81, 94 (1830); DR 7-101(a)(3) (a lawyer shall not prejudice or damage his client during the course of the professional relationship).

The same principle underlies the rules that seek to ensure that lawyers not take financial advantage of their clients. Opinion, at 3. The same fundamental principle of fiduciary obligation that underlies the specific rules governing attorney-client financial dealings implies as well that a lawyer should not abuse the client's trust by taking sexual or emotional advantage of her. Protecting a client's emotional and physical well-being is surely as important as protecting the client's financial well-being. Opinion, at 4; Singleton v. Foreman, 435 F.2d 962, 970 (5th Cir.

1970) ("custom requires that the attorney treat his clients with civility, common decency and loyalty, both as to legal problems and as to their personal relationship").

(9) Finally, Andersen committed suicide because [redacted] professional negligence. He rejected her as a love interest after toying recklessly with her emotions over the course of many months. He knew that she was infatuated with him, and he knew she was in an extremely vulnerable position given her on-going divorce proceedings, deep psychological and medical needs, history of suicide attempts and hospitalizations, and his position as her lover and attorney. In fact, it is difficult to conceive of a more vulnerable position than the one in which [redacted] put Andersen. Her suicide was eminently foreseeable and not an intervening or superseding cause of death which exonerates [redacted] An intervening act is a superseding cause which breaks the chain of proximate causation, "only where the original wrongdoer reasonably could not have foreseen such act." Copithorne v. Framingham Union Hosp., 401 Mass. 860, 862 (1988) ("[t]he fact asserted, if proved, would justify a jury's finding that the risk of injury to Copithorne was within the range of foreseeable consequences to the hospital's negligence in continuing Helfant's staff privileges"). Where suicide is a "foreseeable consequence" of professional's negligence, such suicide may not be an independent intervening cause between an anterior act of negligence and death. Carney v. Tranfaglia, 57 Mass.App.Ct. 664, 669-670 (2003). In addition, there can be no comparative negligence on the part of a person who commits suicide where the defendant's duty of care includes preventing the self-abusive or self-destructive acts that caused the plaintiff's injury. McNamara v. Honeyman, 406 Mass. 43, 55 (1989). Negligent tortfeasors may be held liable for the suicide of persons who, as a result of their negligence, suffer mental disturbance destroying the will to survive, if the suicide is a foreseeable risk associated with the alleged wrongful acts of the defendants. D'Addezio v. Agway Petroleum Corp., 186 A.D. 2d 929, 931 (1992).

Here, it was eminently foreseeable to [redacted] that, given Andersen's precarious emotional and psychological state including her repeated suicide attempts, his actions in drawing her into a sexual relationship, then alternatingly pushing her away and pulling her back in would cause her to again attempt suicide. Where a professional's negligence "substantially contributed" to suicide, that professional's negligence becomes the proximate cause of the suicide. Koren v. Weihs, 201 A.D.2d 268, 269 (1994) ("Because defendant had been decedent's psychiatrist and possessed detailed knowledge of her history, it cannot be said that the risk of decedent's suicide as a consequence of defendant's alleged sexual relationship with her was attenuated or unforeseeable. The presence of other stressful factors in decedent's life does not displace defendant's alleged acts as a proximate cause of the suicide, since it is necessary only that they 'substantially contributed' to the death.")

Andersen's suicide note, when coupled with the surrounding facts and circumstances of this case, makes clear that [redacted] conduct substantially contributed to and was a substantial factor in Andersen's suicide. At a minimum these are questions of fact. O'Brien v. Kobrin, 11 Mass. L. Rptr. 593 (2000) ("[i]n the present case, the estate has proffered the expert opinion of Dr. Floyd Price that, to a reasonable degree of medical certainty, Kobrin's failure to evaluate O'Brien in person substantially contributed to her suicide. This is sufficient to survive summary judgment"); Johnson v. Summers, 411 Mass. 82, 88 (1991). These questions of fact will entitle the plaintiff to a jury trial.

Andersen's willingness to enter into a sexual relationship with [redacted] while serving as her lawyer does not weigh against his negligence. The client's consent to sexual relations alone will rarely be sufficient to eliminate the ethical dangers thereof for the attorney. In many cases, the client's ability to give meaningful consent is vitiated by the lawyer's potential undue influence and/or the emotional vulnerability of the client. Opinion, at 6. Furthermore, Andersen could not possibly have known the legal harms to which [redacted] was exposing her case.

A sexual relationship between a fiduciary and beneficiary is improper in many circumstances, Doe v. Harbor Schools, Inc., 446 Mass. 245, 253 (2006), and it was certainly so under these circumstances. Commencing an intimate relationship with a client in these circumstances violated the Massachusetts Rules of Professional Conduct, Rule 1.7(b), and the American Bar Association Model Rules of Professional Conduct, Rule 1.7(a), both of which prohibit attorneys from representing clients where the representation of that client may be materially compromised by the lawyer's own interests. See Case of Bourdon, 132 N.H. 365, 372 (1989) (intimate relationship between attorney and client is a *per se* violation of Professional Conduct Rule 1.7). Particularly in the divorce law context, sex between the attorney and client is an obvious breach of the duty of loyalty, a conflict of interest, and an unfair and deceptive business practice. See Matter of Lewis, 262 Ga. 37, 38 (1992) ("[e]very lawyer must know that an extramarital relationship can jeopardize every aspect of a client's matrimonial case"); DiSandro, 680 A.2d at 75 (sexual relationship between attorney and client in a divorce case creates an "inherent conflict" between the client's interests and the attorney's personal agenda).

The Lawyers Professional Liability Policy issued by Liberty Insurance Underwriters, Inc. (the "Policy"), states:

> We agree to pay on your behalf all damages in excess of the deductible amount and up to the limits of liability stated in the Declarations that you become legally obligated to pay, provided such damages:

1. result from claims...

2. are caused by a wrongful act which takes place before or during the policy period but not before the Retroactive Date set forth in the Declarations, if any.

Policy, p. 1 (internal emphasis omitted). "Wrongful act" is defined as, "any actual or alleged act, error, omission or personal injury which arises out of the rendering or failure to render professional legal services." Id., p. 3. Because the acts, errors, omissions and personal injuries at issue in this case arose out of the rendering or failure to render professional legal services, the Policy covers the losses in this case.

Sincerely,

Robert D. Cohan

RDC/ams
cc: Jonathan D. Plaut, Esq.

C:\My Files\S\Sanders, Harr[redacted] Settlement ltr 12-11-28.doc

# EXHIBIT C

Attorney Jonathan D. Plaut
Chardon Law Offices
One State Street, Suite 1200
Boston, MA 02109

June 7, 2013

Re: Estate of Nancy Andersen v. Adam and

Dear Attorney Plaut,

At your request I reviewed several documents in order to provide an opinion regarding Ms. Andersen's suicide on September 29, 2011. More specifically, you asked that I provide an opinion regarding the following two questions:

1.) Whether the alleged relationship between Attorney z and his client, Nancy Andersen, was a substantial casual factor in her suicide?
2.) Whether Attorney knew or should have known that Ms. Andersen was at risk of suicide?

**Qualifications of the Examiner:**
I have enclosed my curriculum vitae, which state my qualifications to perform this examination.

**Sources of Information:**
A. Documents from Dr. Higgins 001-0450
B. Documents from Dr. Kramer 001-0054
C. Exhibits Binder- Exhibits 1-87 – Sanders:

1. Tab 1 - EB00001
2. Tab 2 - EB00139
3. Tab 3 - EB00140
4. Tab 4 - EB00143
5. Tab 5 - EB00188
6. Tab 6 - EB00189
7. Tab 7 - EB00215
8. Tab 8 - EB00216
9. Tab 9 - EB00218
10. Tab 10 - EB00219
11. Tab 11 - EB00226
12. Tab 12 - EB00231
13. Tab 13 - EB00379
14. Tab 14 - EB00382

15. Tab 15 - EB00384
16. Tab 16 - EB00385
17. Tab 17 - EB00430
18. Tab 18 - EB00432
19. Tab 19 - EB00433
20. Tab 20 - EB00435
21. Tab 21 - EB00436
22. Tab 22 - EB00437
23. Tab 23 - EB00446
24. Tab 24 - EB00447
25. Tab 25 - EB00450
26. Tab 26 - EB00451
27. Tab 27 - EB00453
28. Tab 28 - EB00454
29. Tab 29 - EB00473
30. Tab 30 - EB00474
31. Tab 31 - EB00476
32. Tab 32 - EB00478
33. Tab 33 - EB00482
34. Tab 34 - EB00486
35. Tab 35 - EB00487
36. Tab 36 - EB00490
37. Tab 37 - EB00491
38. Tab 38 - EB00498
39. Tab 39 - EB00500
40. Tab 40 - EB00501
41. Tab 41 - EB00504
42. Tab 42 - EB00505
43. Tab 43 - EB00506
44. Tab 44 - EB00513
45. Tab 45 - EB00514
46. Tab 46 - EB00524
47. Tab 47 - EB00533
48. Tab 48 - EB00543
49. Tab 49 - EB00545
50. Tab 50 - EB00601
51. Tab 51 - EB00606
52. Tab 52 - EB00609
53. Tab 53 - EB00610
54. Tab 54 - EB00612
55. Tab 55 - EB00615
56. Tab 56 - EB00622
57. Tab 57 - EB00626

58. Tab 58 - EB00627
59. Tab 59 - EB00628
60. Tab 60 - EB00629
61. Tab 61 - EB00630
62. Tab 62 - EB00631
63. Tab 63 - EB00637
64. Tab 64 - EB00638
65. Tab 65 - EB00639
66. Tab 66 - EB00665
67. Tab 67 - EB00677
68. Tab 68 - EB00714
69. Tab 69 - EB00716
70. Tab 70 - EB00725
71. Tab 71 - EB00730
72. Tab 72 - EB00732
73. Tab 73 - EB00733
74. Tab 74 - EB00734
75. Tab 75 - EB00736
76. Tab 76 - EB00737
77. Tab 77 - EB00742
78. Tab 78 - EB00743
79. Tab 79 - EB00752
80. Tab 80 - EB00763
81. Tab 81 - EB00791
82. Tab 82 - EB00792
83. Tab 83 - EB00793
84. Tab 84 - EB00813
85. Tab 85 - EB00835
86. Tab 86 - EB00836
87. Tab 87 - EB00842

**Brief Summary of the Facts:**

Nancy Andersen and Harry Sanders were married in Winnetka, Illinois on August 27, 1994. They had one child, Kenny, who was born on July 9, 1996. The family lived together in Newton, Massachusetts until December 28, 2010, when Ms. Andersen and Kenny moved out. At that time, Ms. Andersen and Mr. Sanders were in marital discord. Ms. Andersen took out a restraining order against Mr. Sanders after she reportedly witnessed Mr. Sanders physically assault Kenny.

In January 2011 Ms. Andersen met with Attorney [redacted] to discuss her marriage including reconciliation and divorce proceedings. Ms. Andersen described in her emails to Attorney [redacted] a desire to reconcile with her husband. Over the course of the next few months Ms. Andersen vacillated between her desire to reconcile or to divorce. On

April 5, 2011 Kenny moved in with his father after telling the Court this was his preference. On April 6, 2011 Ms. Andersen made a suicide attempt by overdosing on prescription medications. She was subsequently hospitalized at Newton Wellesley Hospital.

On April 11, 2011 Ms. Andersen signed a fee agreement with Attorney [redacted] firm to file for divorce. Attorney [redacted] filed for the divorce on May 4, 2011. Ms. Andersen began to write journal entries in June 2011 identifying her attraction to Attorney [redacted]. Attorney [redacted] emailed Ms. Andersen on July 28, 2011 "keep smiling, am sending you a hug and a kiss, many in fact :-) - According to Louis Chagnon, LICSW, Ms. Andersen's therapist, "Andersen is having an affair with her lawyer who is also a licensed social worker. He came to rescue her in 2x suicide attempt, brought her strawberries."

Ms. Andersen made journal entries of her feelings towards Attorney [redacted] between August 2011 and her suicide in September 2011. On August 14, 2011 she wrote a journal entry addressed to [redacted]-...What happened? I'd like to think it's not over, but it is, it is, as decent as you were today, you always, you also made it clear, it's over. What happened? I seduced a little too much, perhaps, and then revealed in me way too much for anyone to shoulder. Sorry...I love you, don't you realize that? And isn't it pretty obvious my heart can't make one more break-isn't it obvious?" On August 22, 2011 she wrote, "You're clearly vulnerable on 3 fronts: professionally, personally, given your own issues ; and on my front, given my issues, it's ok, but we should transition my case asap."

Attorney [redacted] contacted the police after finding Ms. Andersen dead in her bed. According to the Watertown Police Department Report, there were pills, a quarter full bottle of wine, pictures of a young boy and a couple of notes including at least one apparent suicide note around her body. The Medical Examiner's report of death was "ethanol abuse." Of the notes found at Ms. Andersen's house at the time of her death, one is addressed to [redacted] and reads "Where were you , you said you'd come, even if it was 3am-it's so hard for me not to conclude-I just didn't matter enough to anyone-how pathetic."

**Bates Higgins 0059-0061 Newton Wellesley Hospital History of Physical Examination, dated 04/06/11, signed by J. Ragland, M.D.:**

**Bates Higgins 0059**

She is under considerable stress with her family situation. She took out a restraining order for her husband of 17 years in December after she had seen her husband strike her son by her report. Her son has since been living with her. Apparently, her son does not want to live with her and has gone to the court himself, asking that he be able to be with his father,

apparently stating that his father has not abused him in any way. This has been very upsetting for the patient and in the setting of this, she has been drinking more over the past week and this evening, after speaking with her psychiatrist as well as her attorney, she took an overdose of alprazolam, Seroquel, and butalbital. It is unclear exactly how many pills she has taken. Her psychiatrist and attorney called EMS. They needed to break the door down and they found her unresponsive. The son was present in the home. She was intubated in the field. They tried Narcan without any results. She had a normal glucose. She was brought to the Emergency Room.

**Bates Higgins 0059-0060**
She does note that she is under tremendous stress over her family situation. It is very difficult for her to hear that her 14-year-old son wants to live with her husband.

**Bates Higgins 0060**
FAMILY HISTORY: Brother had a suicide attempt in the past.

**Bates Higgins 0061**
She is on methylprednisolone for presumed dermatitis related to possible mites or bug bites of some sort and that is improving. however, in the setting of significant stress over her son presenting to a judge last week requesting that he stay with his father, the patient has taken an intentional drug overdose as a suicide attempt.

**Bates Higgins 0064 Newton Wellesley Hospital Discharge Summary, dated 04/06/11, signed by J. Bartz, M.D.:**
Her psychiatrist and attorney called EMS after she was speaking with him on the phone and they were concerned for drug overdose.

Please note. the patient is under significant stress at home whereas she has a restraining order against her husband of 17 years after seeing her husband strike her son. However, her son went to court last week so that he can live with his father.

**Bates Higgins 0069 Patient Care Note, dated 05/31/11, signed by Dr. Toran:**
At her last visit note was made that she did not look well i.e. seems to have lost weight and appears tense and frazzled.

She looks the same today. and thus I have explained to her that stress plays a very significant role in the management of migraine and we have spent considerable time discussing her current situation. The problems with her husband and son are substantial.

**Bates Higgins 0071 Patient Care Note, dated 04/02/11, signed by Dr. Toran:**
Compared with previous visits here she does not look well i.e. seems to have lost weight and appears tense and frazzled.

Given the difficulties of this past year with her husband and son, she is fortunately aligned with therapists being of help.

**Bates Higgins 0131 Office Visit, dated 02/01/08, signed by M. Higgins, M.D.:**
She has a problem with chronic depression and has been seeing a counselor regularly. She has been on Paxil and alprazolam which have been helping. There has been a lot of stress in her life recently and the symptoms have worsened and it was recommended that she take time off from work because of the depression symptoms.

**Bates Higgins 0150 Office Visit, dated 06/18/07, signed by M. Higgins, M.D.:**
She presents with anxiety and depression. Recently she has been under a lot of stress. She recently lost her sister.

She is planning to see a psychiatrist at some point. She wanted to discuss going on medications.

Begin Paxil 10 mg daily in the a.m..

**Bates Higgins 0154 Follow-Up Physical, dated 03/13/07, signed by M. Higgins, M.D.:**
She is having difficulty sleeping at night. She has a sister who is dying from vulvar cancer. She wonders whether she can take something to help her sleep.

Trial of Xanax 0.5 mg in the evening PRN.

**Bates Higgins 0376 Patient Care Note, dated 02/01/10, signed by Dr. Toran:**
The only other significant history, from the vantage point of review of emergency room visits, has been the ones related to depression; seemingly related to an acute precipitant i.e. the death of her sister from cancer over a fairly short period of time. She gives no antecedent history of depression.

**Bates Kramer 0007 Progress Note, dated ?/04/08, signed M. S. Kramer M.D.:**
Despite a history of childhood sexual abuse as well as alcohol abuse, no mental health treatment until one year ago with Dr. O'Neil.

**Bates Kramer 0019 Progress Note, dated 04/13/11, signed M. S. Kramer M.D.:**
Hospitalized for overdose at NWH 4/5-4/11, precipitated by an awful experience in Court earlier on 4/5. Husband Harry and 14 yo son Kenny "bashed me" at a hearing focused on "parental alienation." N is convinced that Harry has been turning Kenny against her. She had filed a restraining order to counter "parental alienation" but Kenny refused to live with her or abide by the restraining order. N agreeing to withdraw restraining order.

Extremely uncertain about Kenny, who is in trouble in school for bullying, inappropriate language and behavior, and Facebook entries.

Appears agitated, anxious, angry, but coherent, determined to persevere and restore Connection with Kenny. Acknowledges taking the overdose in an effort to neutralize the acute distress, but denies an active will to die.

**Bates Kramer 0022 Progress Note, dated 05/27/11, signed M. S. Kramer M.D.:**
Dx: In addition to PTSD and alcohol dependence, acute stress of "parental alienation," hospitalization, and separation with temporary relocation on Axis IV.

**Bates Kramer 0024 Progress Note, dated 07/01/11, signed M. S. Kramer M.D.:**
Extra meeting to address daytime agitation generated by impasse with husband and son.

**Bates Kramer 0026 Progress Note, dated 09/07/11, signed M. S. Kramer M.D.:**
Remains distraught over situation with family, but is determined to stay connected and restore access to Kenny. Workplace is positive and supportive. Feels positively about new therapist.

**Bates EB00093 Journal Entry, dated 08/25/08, by Nancy Andersen:**
A week after nearly accidentally offing myself. Pretty stupid, desperate cry for love. [Illegible] back from MSP- crying, crying, notes must find—crying out for love—returned to Harry's anger and disgust, when all I wanted was to be held in his arms, cherished, comforted. How foolish of me, really, what was I expecting?

**Bates EB00133 Journal Entry, not dated, by Nancy Andersen:**
I fear, I expect, one of us will not survive this and, [Illegible] me, but for… How to minimize suffering?

**Bates EB00137 Journal Entry, not dated, by Nancy Andersen:**
Adam, know you've been a prince of a man, a helluva counsel, a gentleman. Please take care of Kenny, best you can, through a trust?

**Bates EB00138 Journal Entry, 06/09/11 by Nancy Andersen:**
I'm fucked. I'm royally fucked, and I've as much to blame myself, as anyone else.

**Bates EB00216 Letter Addressed to Ms. Andersen, dated 04/11/11, Re: Legal Fee Arrangement- Divorce Nancy Andersen v Harry Sanders, signed by [redacted] Esq. and Nancy Andersen:**
Dear Ms. Andersen:

This is to confirm that I have undertaken to represent you regarding the above captioned matter, seeking remedies we have discussed relative to your case.

**Bates EB00384 Journal Entry, 06/26/11, by Nancy Andersen:**

But do you not—you must—know how I long for you. crave the warmth of your arms around me. So insatiable right now, tho my belly is too full from tonight's dinner. yet I rustle thru the bag of goodies you brought, eating sweetest small treat. helping to sate in some way this tremendous desire.

Please know. absent your lovely presence these past months. my life would be diminished and with the beauty of life and light that shines from within you. I am reminded of all I have. all I am. and all I can be.

**Bates EB00385 Journal Entry, 06/27/11, by Nancy Andersen:**
Oh lovely and mysterious man, I don't know what to make of you- how I wish that you. [Illegible] and only you ("[Illegible] like Heaven") will be there alongside me, til the end of this morass.

**Bates EB00421 Journal Entry, 03/29/11, by Nancy Andersen:**
3/29- Wow, what a day!

At some point (and dang remember the laptop next time. much more efficient.) I'll perhaps run away. I'll be considered throwing in the towel, perhaps legally 'abandoning' Kenny? How the hell does a mother do that? Well, at some point, it'll be that, or killing myself and which of those 2 options are better? I mean. maybe a break could I plan it out? I feel so trapped, so helplessly locked in this stupid battle of control. anger. anxiety- no not anxiety. desperation. Suicidal ideation better #39. (Just kidding but seriously, another good reason not to allow free access to guns.

**Bates EB00435 Journal Entry, 08/14/11, labeled "[redacted] by Nancy Andersen:**
So- what happened here? In the words of Dylan "Goodbye too good a word. Babe, so I'll just say fare thee well."

What happened? I'd like to think it's not over, but it is, it is, as decent as you were today, you gentleman always, you also made it clear, its over.

What happened? I seduced a bit too much perhaps, and then revealed [Illegible] way to much for anyone to shoulder. Sorry.

I love you. don't you realize that? And isn't it pretty obvious my heart can't take one more break- isn't it obvious?

**Bates EB00436 Journal Entry, 08/18/11 and 08/22/11, by Nancy Andersen:**
08/18/11

So, it was a nice send-off anyway- food, lovemaking. I said whatever happens I'll be ok- he's one of the best things that's happened to me in a long time and he said. not THE best thing?

08/22/11
Nice email, if not so effusive. My reply. I'm sure scared you. Can I do it, can I really "let it pass and hold my tongue and you will think that I've moved on"? We'll see. You're clearly vulnerable on 3 fronts: professionally; personally, given your own issues; and on my front, given my issues. It's ok. but we should transition my case, asap. And I need to understand what's in store. what I'll be facing on Sept. 13th.

**Bates EB00446 Journal Entry, 08/23/11, by Nancy Andersen:**
White Flag
I will go down with this ship. I won't put my arms up and surrender. There will be no white flag across my door. I'm in love, always will be xxoo
Kenny Wendy
Harry Bonnie
[redacted] Connie
Carol Jim
Becky Forde

Sorry, so sorry.

N.

**Bates EB00448-EB00449 Journal Entry, 08/26/11, by Nancy Andersen:**
With respect to [redacted] I realize I may need to- I should in fact- meet with him once more, personally, but perhaps in a public place to talk. We need to shelve this, entirely, I need to have the case transferred tho your presence has brought me great happiness, it has also been a source of ~~great~~ anxiety, confusion, and heartache. I cannot afford that destruction, no matter how tempting, no matter how great my affection for you-I have not changed the way I feel for you. I feel a tremendous affinity with you; when we are together ~~you bring me great joy~~; I am sometimes amazed by our compatibility, our shared interests, from life's little joys to profound experiences and greater meanings of what some call "the human condition". I suspect you have many of the same feelings, but many, many reservations about me and indeed fear of me. and you have every right to. (that's what I meant by read "white Flag- filled with anguish, perhaps, but I am ready to move on, and you needn't worry—that I'll fall apart, that I will bring harm or worry to you, professionally or personally- "I promise I'm not trying to make life harder or return to where we were." Perhaps this is my attempt to pre-empt feeling jilted (!) and certainly, necessarily you would have continued to distance yourself, feeling trepidation for sending me over the deep end- so let me assure you, I won't go down w. this ship- I will be strong. I have the tremendous capacity and competence, strength, and now is the time to call on it,

w/o distraction. w/o reservation I don't know that I can compartmentalize as well as you- so that may mean needing to transfer the case, as much as possible. certainly at least the leg work, tho I still feel you might be best in court. Perhaps entirely, even.

Thank you. thank you- you have been so kind. so caring. and I've been a basketcase- we can't go on like that. So lets say. we shelve this, set it aside; what the future holds it holds even as I can now acknowledge that the possibility of a future together. given our circumstances, is probably remote. please know you have brought me great happiness, a ray of sunshine in an otherwise dismal time of my life. I have so much to live for, you reminded me of that- and now. I need to focus on that, on my own strength. w/ resorting to emotional turmoil and someone to pick me up every time I fall down.

W. the greatest of affection- Nancy

**Bates EB00450 Journal Entry, 08/28/11, Addressed, '[redacted] by Nancy Andersen:**
At the same time please recognize too that regardless of who 'started' this for we both have a hand in it- that you got me at a very vulnerable time- (I mean. sheesh, shortly after a 2nd suicide attempt?!) draw me in with your kindness and affection. I was utterly smitten. head over heals- and then. you pulled back. I'm not sure quite why. quite what- was it something I did, or did you simply come to your senses? It has caused me great heartache and loneliness when you pull back, show up again. and then pull back. please, dear gent, think twice next time.

**Bates EB00473 Journal Entry, dated 09/08/11, Addressed to '[redacted] by Nancy Andersen:**
Adam- Why. why why? So stupid, so foolish. so dangerous, a game- Why, I'm trying to pull away, yet the more I try, the more you pull me back. I'm so ambivalent Why? Is it that you think you can save me? Are you feeding your own ego? Why?

As a rubber band I will stretch, stretch. and then break – hopefully. break, from you, altogether, lawyer. lover- better than breaking in the alternative.

God, how can you possible think this is good for me other than my own pitiful insatiable need for someone. long last. to care for me- and when its over. well. I fear, its really over. Because don't you see. its all the same. so consistent, you're abandoning me just like all the rest.

So don't, dear sir. don't ever make a promise- no matter how implicit - that you can't keep- think twice. please. Think twice.

**. Bates EB00478-EB00479 Journal Entry, dated 09/29/11, Labeled "Bye" by Nancy Andersen**
In these notes I've said 'bye. dozens, hundreds of times, and this last, hopefully, I will really say- 'bye'.

There is nothing else, there is nothing left to do-

Just call a few people → phone passwords: BB1 QWAS BB2 11571
-Wendy & Bonnies
-Becky Christian
- Work, Frank
-David Pyrysys- in La Jolla, CA
612-886-2214
Forde 651-387-3333
Carol 508-697-2506
Connie 508-543-9563
Wendy Wells [Illegible] 1308 233rd Ave SE Samamish WA 98075
Frank 839-7755 (617)

And don't 'sugar-coat' it please- the plain truth is, I've decided to take my life- I've thought long and hard about it- and this is it, my choice. Don't hide that fact from anyone. Kenny, my sister, Harry, my friends, co-workers, anyone it is what it is.

Oh, And Call
Lou Chagnan, Please.
My therapist, [Illegible]
Had NO idea, but should know-
617-758-9108
& Mark Kramer MD 254-0800

**Bates EB00480 Journal Entry, dated 09/29/11 7:10pm, by Nancy Andersen**
And there is the matter of Kenny, this you must know, this he can read know- My heart is broken, my soul shattered, there is no more, really. As much as I ever experienced it- the big boy, [Illegible], unity consciousness, call it what you will, I know what it was- I thought perhaps it could surpass all, even the most broken of hearts- but have apparently, sadly, concluded no, when one loses the love of a child, once loses life.

Where were you Adam, you said you'd come, even if it was 3am- It's so hard for me not to conclude- I just didn't matter enough to anyone- how pathetic.

**Bates EB00483 Watertown Police Department Report, dated 10/02/11, Submitted by Officer Brendan Donahue:**

During this Officer Zengo met with Mr[redacted] and spoke to him about what had happened and his discovery of Ms. Andersen. Mr[redacted] told Office Zengo that he was Ms. Andersen's attorney, he had been representing her in her divorce from Mr. Sanders, that the divorce had been "rough," and that there was an upcoming, scheduled court date for the case. Mr. [redacted] told Officer Zengo that the last time he talked to Ms. Andersen was sometime on Thursday, 9/29/11, and he had called her to inform her about the upcoming court date and she had made a statements to the effect that she wasn't interested in attending. Mr. [redacted] told Officer Zengo that he tried to make contact with her again sometime after that but he could not get in contact with her and se he became concerned because he knew that she had previously attempted suicide. He told Officer Zengo that he became so concerned that he went to 489 Mt. Auburn St. on 10/1/11 to check on her and when he got to the apartment, he tried to reach Ms. Andersen but with no success. He said he saw that her car was in the driveway, there was unopened mail for her waiting to be picked up but her bicycle was no where to be seen. He said that he knew Ms. Andersen was an avid biker so he thought she might have taken it out and that was why he could not reach her and so he left. He told Officer Zengo that he continued to try to reach her by phone but with no success so he returned on 10/2/11 at approximately 1800 hours and after not being able to reach her, he went to the rear stairwell, walked up it and found an unlocked window in the middle bedroom, opened it and went into the apartment. It was at that time that he found Ms. Andersen and he immediately contacted the police.

**Bates EB00486 Medical Examiners Certificate of Death, dated 10/11/11, signed by John Parker, M.D.:**
35d DESCRIBE HOW INJURY OCCURRED
ETHANOL ABUSE

**Bates EB00496 Intake Form, undated, unsigned:**
HISTORY OF SUICIDAL BEHAVIORS
Have you ever considered or actually attempted suicide? If yes, explain:
Yes. Following sister's death in 2007, and son's alienation in Spring 2011.

**Bates EB00525 Affidavit of Plaintiff Nancy Andersen, dated 08/10/11, signed by Nancy Andersen:**
(I had a 6 month period of major depression from November 2007 to April 2008).

**Bates EB00529 Affidavit of Plaintiff Nancy Andersen, dated 08/10/11, signed by Nancy Andersen:**
On April 5th, enormously despondent over Kenny's rejection of me, I regrettably overdosed on pills that night, and was admitted to Newton Wellesley Hospital.

**Bates EB00622 Email Sent to [redacted] from Nancy Andersen, dated 04/05/11:**
Here's the really awful thing that an on-again-off-again-suicidal— ideation mind goes thru: "Okay, here's a window of opportunity-I've taken care of affairs for Kenny today (i.e. one can't really check out with a kid not having at least on parent present, no? At least I accomplished that today.) Hm, here's my chance.

This. I vacillate almost hourly between a sense of freedom, relief, and utter despondence.

**Bates EB00732 Email Sent to Nancy Andersen from [redacted] dated 07/28/11:**
Hi there Nancy.

All good here! Sorry I didn't call sooner last night, long talks with sister Kim, nice. Hope you got my rambling call anyway. Thought your picture terrific, reminded me of our very fine week end, all events, happenings wonderful, thank you again.

I too miss you, yes, your pic helps, love your smile.

I was able to access other address, so that would be good to use. I'll call sometime tonight. Do hope your staying on the road to D. it's the rest of your earthly journey on balance...

Keep smiling, am sending you a hug and a kiss, many in fact:-)

**Bates EB00798-EB00802 Medical Records from L. Chagnon, LICSW, dated 07/28/11:**
Pt overdosed the day son went to FA's April 5th. Pt od's on fiorinol was premeditated I didn't want to go on with that rejection.

April 5th spent AM in court PM rents an APT. Made appt with CALIF. Rxist and took OD when with him on phone.

Pt is now having an affair with lawyer (also LICSW) he came to rescue her in 2nd suicide attempt. He brought her strawberries in Hosp.

? of whether she should use him for GAL.

**Bates EB00807 Medical Records from L. Chagnon LICSW, dated 9/18/11:**

Wonders values her. Since she told him the relationship was doomed he's been more attracted.

**Bates EB00808 Medical Records from L. Chagnon LICSW, dated 9/12/11:** Locked a little better than usual. Have spent a lovely day with

Talked about her fear that the relationship was doomed.

I brought up the possibility that would love both the professional and the personal relationship simultaneously.

<u>Opinion:</u>
I will address the two referral questions posed to me.

1.) Whether the alleged relationship between Attorney [redacted] and his client, Nancy Andersen, was a substantial casual factor in her suicide?

It is my opinion with reasonable medical certainty that the relationship between Attorney [redacted] and Ms. Andersen was a substantial casual factor in her suicide on September 29, 2011. The following evidence supports this opinion:

a. Ms. Andersen made several journal entries detailing her disappointment when the relationship ended with Attorney [redacted]
    i. **According to Bates EB00435 Journal Entry, 08/14/11, labeled [redacted] by Nancy Andersen:** So- what happened here? In the words of Dylan "Goodbye too good a word, Babe, so I'll just say fare thee well." What happened? I'd like to think it's not over, but it is, it is, as decent as you were today, you gentleman always, you also made it clear, its over. What happened? I seduced a bit too much perhaps, and then revealed [Illegible] way to much for anyone to shoulder. Sorry. I love you, don't you realize that? And isn't it pretty obvious my heart can't take one more break- isn't it obvious?

    ii. **According to Bates EB00448-EB00449 Journal Entry, 08/26/11, by Nancy Andersen:** With respect to [redacted] I realize I may need to- I should in fact- meet with him once more, personally, but perhaps in a public place to talk. We need to shelve this, entirely, I need to have the case transferred tho your presence has brought me great happiness, it has also been a source of great anxiety, confusion, and heartache. I cannot afford that destruction, no matter how tempting, no matter how great my affection for you-I have not changed the way I feel for you. I feel a tremendous affinity with you: when we are together you bring

me great joy ; I am sometimes amazed by our compatibility, our shared interests , from life's little joys to profound experiences and greater meanings of what some call "the human condition". I suspect you have many of the same feelings, but many, many reservations about me and indeed fear of me, and you have every right to. (that's what I meant by read "white Flag- filled with anguish, perhaps, but I am ready to move on, and you needn't worry—that I'll fall apart, that I will bring harm or worry to you, professionally or personally- "I promise I'm not trying to make life harder or return to where we were." Perhaps this is my attempt to pre-empt feeling jilted (!) and certainly, necessarily you would have continued to distance yourself, feeling trepidation for sending me over the deep end- so let me assure you, I won't go down w. this ship- I will be strong, I have the tremendous capacity and competence, strength, and now is the time to call on it, w/o distraction, w/o reservation I don't know that I can compartmentalize as well as you- so that may mean needing to transfer the case, as much as possible, certainly at least the leg work, tho I still feel you might be best in court. Perhaps entirely, even.

Thank you, thank you- you have been so kind, so caring, and I've been a basketcase- we can't go on like that. So lets say, we shelve this, set it aside; what the future holds it holds even as I can now acknowledge that the possibility of a future together, given our circumstances, is probably remote, please know you have brought me great happiness, a ray of sunshine in an otherwise dismal time of my life. I have so much to live for, you reminded me of that- and now, I need to focus on that, on my own strength, w/ resorting to emotional turmoil and someone to pick me up every time I fall down.

W. the greatest of affection- Nancy

iii. **According to Bates EB00450 Journal Entry, 08/28/11, Addressed, '[redacted] by Nancy Andersen:** At the same time please recognize too that regardless of who 'started' this for we both have a hand in it- that you got me at a very vulnerable time- (I mean, sheesh, shortly after a 2nd suicide attempt?!) draw me in with your kindness and affection, I was utterly smitten, head over heals- and then, you pulled back. I'm not sure quite why, quite what- was it something I did, or did you simply come to your senses? It has caused me great heartache and loneliness when you pull back, show up again, and then pull back, please, dear gent, think twice next time.

iv. **According to Bates EB00473 Journal Entry, dated 09/08/11, Addressed to "[redacted] by Nancy Andersen:** Why, why why? So stupid, so foolish, so dangerous, a game- Why, A I'm trying to pull away, yet the more I try, the more you pull me back. I'm so ambivalent Why? Is it that you think you can save me? Are you feeding your own ego? Why? As a rubber band I will stretch, stretch, and then break -- hopefully, break, from you, altogether, lawyer, lover- better than breaking in the alternative. God, how can you possible think this is good for me other than my own pitiful insatiable need for someone, long last, to care for me- and when its over, well, I fear, its really over. Because don't you see, its all the same, so consistent, you're abandoning me just like all the rest. So don't, dear sir, don't ever make a promise- no matter how implicit – that you can't keep- think twice, please. Think twice.

b.) On the day of her suicide Ms. Andersen indicated that she was intentionally taking her life.

i. According to Bates EB00478-EB00479 Journal Entry, dated 09/29/11, Labeled "Bye" by Nancy Andersen: And don't 'sugar-coat' it please- the plain truth is. I've decided to take my life-I've thought long and hard about it-and this is it, my choice. Don't hide that fact from anyone, Kenny, my sister, Harry, my friends, co-workers, anyone it is what it is.

ii. Ms. Andersen also made a journal entry on the day of her suicide about her disappointment that [redacted] did not come. **According to Bates EB00480 Journal Entry, dated 09/29/11 7:10pm, by Nancy Andersen:** And there is the matter of Kenny, this you must know, this he can read know- My heart is broken, my soul shattered, there is no more, really. As much as I ever experienced it- the big boy, [Illegible], unity consciousness, call it what you will, I know what it was- I thought perhaps it could surpass all, even the most broken of hearts- but have apparently, sadly, concluded no, when one loses the love of a child, once loses life. Where were you Adam, you said you'd come, even if it was 3am- It's so hard for me not to conclude- I just didn't matter enough to anyone- how pathetic.

2.) Whether Attorney [redacted] knew or should have known that Ms. Andersen was at risk of suicide?

It is my opinion with reasonable medical certainty that Attorney [redacted] knew or should have known that Ms. Andersen was at risk of suicide. The following evidence supports this opinion:

a. Attorney [redacted] was aware of Ms. Andersen's psychiatric history including her history of depression, alcohol abuse and suicide attempts.

   i. The Newton Wellesley Hospital record indicates Attorney [redacted] called EMS after Ms. Andersen's suicide attempt in April 2011. According to the **Bates Higgins 0059-0061 Newton Wellesley Hospital History of Physical Examination, dated 04/06/11, signed by J. Ragland, M.D.:** It is unclear exactly how many pills she has taken. Her psychiatrist and attorney called EMS. They needed to break the door down and they found her unresponsive. According to **Bates Higgins 0064 Newton Wellesley Hospital Discharge Summary, dated 04/06/11, signed by J. Bartz, M.D.:** her psychiatrist and attorney called EMS after she was speaking with him on the phone and they were concerned for drug overdose.

   ii. Attorney [redacted] prepared the Affidavit entitled "Affidavit of Plaintiff Nancy D. Andersen." According to the **Bates EB00525 Affidavit of Plaintiff Nancy Andersen, dated 08/10/11, signed by Nancy Andersen:** (I had a 6 month period of major depression from November 2007 to April 2008). According to **Bates EB00529 Affidavit of Plaintiff Nancy Andersen, dated 08/10/11, signed by Nancy Andersen:** On April 5th, enormously despondent over Kenny's rejection of me, I regrettably overdosed on pills that night, and was admitted to Newton Wellesley Hospital.

   iii. The Affidavit of Harry M. Sanders signed 09/30/2011 includes a noted Certification of Service that a copy was sent to Plaintiff's Attorney of Records, [redacted] A. [redacted] According to the Bates **EB00534 Affidavit of Harry M. Sanders, dated 09/30/2011 signed by Harry Sanders:** Nancy was out of control drunk and acting suicidal. The therapist wanted to call 911 but agreed to my brining Nancy to the hospital so that I could bring her to Newton Wellesley Hospital…

   iv. Ms. Andersen sent Attorney [redacted] an email in which she reported suicidal ideation. According to the Bates EB00622 **Email Sent to [redacted] from Nancy Andersen, dated 04/05/11:** Here's the really awful thing that an on-again-off-again-suicidal—ideation mind goes thru: "Okay, here's a window of

opportunity-I've taken care of affairs for Kenny today (i.e. one can't really check out with a kid not having at least on parent present, no? At least I accomplished that today.) Hm, here's my chance. This, I vacillate almost hourly between a sense of freedom, relief, and utter despondence.

v. According to Ms. Andersen's therapist's records, Attorney [redacted] visited her when she was hospitalized for the suicide attempt in April 2011. **According to Bates EB00798-EB00802 Medical Records from L. Chagnon, LICSW, dated 07/28/11:** Pt is now having an affair with lawyer (also LICSW) he came to rescue her in 2[nd] suicide attempt. He brought her strawberries in Hosp. ? of whether she should use him for GAL.

vi. Attorney [redacted] identified his knowledge of Ms. Andersen's history of suicide attempts and his concern for her ongoing suicidality in the Watertown Police Department Report. According to the **Bates EB00483 Watertown Police Department Report, dated 10/02/11, Submitted by Officer Brendan Donahue:** During this Officer Zengo met with Mr [redacted] and spoke to him about what had happened and his discovery of Ms. Andersen. Mr. [redacted] told Office Zengo that he was Ms. Andersen's attorney, he had been representing her in her divorce from Mr. Sanders, that the divorce had been "rough," and that there was an upcoming, scheduled court date for the case. Mr. told Officer Zengo that the last time he talked to Ms. Andersen was sometime on Thursday, 9/29/11, and he had called her to inform her about the upcoming court date and she had made a statements to the effect that she wasn't interested in attending. Mr. [redacted] told Officer Zengo that he tried to make contact with her again sometime after that but he could not get in contact with her and he became concerned because he knew that she had previously attempted suicide.

b. Attorney [redacted] was aware that Ms. Andersen was undergoing severe stressors at the time she was in an alleged relationship with him, namely a divorce proceeding and conflict with her only child.

Sincerely,

Renee Sorrentino, MD

# CURRICULUM VITAE

**Date Prepared:** April 8, 2013

**Name:** Renee Marie Sorrentino, MD

**Business Address:** 1233 Hancock St. (Rear)
Quincy, MA 02169
Phone: 617-479-4501 Fax: 617-479-8109

**Appointment:** Clinical Instructor, Psychiatry
Harvard Medical School

**Website:** www.psychiatristforensic.com
www.instituteforsexualwellness.org

**Email:** rsorrentino@partners.org

**Place of Birth:** Rochester, New York

**Education:**

| | |
|---|---|
| 1994 | Boston University, University Professors' Honors Program |
| 1998 | Boston University School of Medicine<br>Mmedic Program |

**Postdoctoral Training:**

| | | | |
|---|---|---|---|
| July 1998- July 1999 | Internship | Internal Medicine | Harvard Medical School<br>Cambridge Hospital |
| July 1999- July 2002 | Residency | Adult Psychiatry | Harvard Medical School<br>Massachusetts General Hospital and McLean Hospital |
| July 2001- July 2002 | Chief Resident | Psychiatric Unit | Massachusetts General Hospital |
| July 2002- July 2003 | Fellowship | Forensic Psychiatry | Case Western Reserve University<br>(Phillip J. Resnick, MD) |
| July 2003 | Clerkship | Sex Offender Program | University of Ottawa<br>(John Bradford, MD) |

**Licensure and Certification:**

| | |
|---|---|
| 2000 | Medical License, Massachusetts #207842 |
| 2004 | Medical License, California #A85826 |
| 2003 | Diplomat, American Board of Psychiatry and Neurology |

| | |
|---|---|
| 2005 | Diplomat, American Board of Forensic Psychiatry |

**Academic and Hospital Affiliated Appointments:**

| | | |
|---|---|---|
| July 2003- Present | Instructor in Psychiatry | Massachusetts General Hospital |
| July 2003- Present | Instructor in Psychiatry | Harvard Medical School |
| July 2006- Present | Instructor in Psychiatry | Tufts Medical School |

**Professional Positions**

**Service Appointments:**

| | | |
|---|---|---|
| October 2003- April 2006 | Director of Forensic Psychiatry | Eric Lindemann Mental Health Center Mass General Hospital, Boston MA |
| July 2003- Present | Forensic Psychiatric Consultant | Park Dietz & Associates Newport Beach, CA |
| July 2006- Present | Director, Institute for Sexual Wellness | Institute for Sexual Wellness, Inc. Quincy, MA |

**Major Committee Assignments:**

| | | |
|---|---|---|
| 2000 - Present | Chairperson, Gender Committee | American Academy of Psychiatry and the Law |
| 2009 - Present | Board Member | Massachusetts Association for the Treatment of Sexual Abusers |
| 2011 - Present | Committee Member, Rappeport Fellowship Committee | American Academy of Psychiatry and the Law |

**Professional Societies:**

American Academy of Psychiatry and the Law, Committee on Gender Issues
American Academy of Psychiatry and the Law, Member Rappeport Fellowship
American Medical Association
American Medical Women's Association
American Neuropsychiatric Association
American Psychiatric Association
Association for the Treatment of Sex Abusers
Association of Women Psychiatrists
Massachusetts Association for the Treatment of Sex Abusers, Board Member
Massachusetts Medical Society
Massachusetts Psychiatric Association
National Alliance for the Mentally Ill

**Community Service Related to Professional Work:**

| | | |
|---|---|---|
| July 1999- July 2002 | Psychiatric Consultant | East Boston District Court<br>East Boston, MA |
| July 2001- July 2002 | Lecturer | Correctional Staff at Nashua Street Jail<br>Boston, MA |
| June 2012 | Lecturer | Harvard Board Review Course: Violence Risk Assessment<br>Boston, MA |

**Editorial Boards:**

Journal of Clinical Neuropsychiatry
Journal of Immigrant and Minority Health

**Awards and Honors:**

| | |
|---|---|
| 2002 | Rappeport Fellow. American Academy of Psychiatry and the Law |
| 2002 | Women Leaders in Psychiatry Award. American Psychiatry Association |
| 2006 | Hilton High School Hall of Fame Recipient |

**Report of Teaching:**

| | |
|---|---|
| July 1999- July 2002 | Tutor for interviewing course for Harvard Medical students |
| July 2002- July 2003 | Chief Resident. Adult Psychiatry Residency, Massachusetts General Hospital |
| July 2002- Present | Clinical Preceptor for Harvard Medical students |
| July 2006- Present | Instructor: Harvard Medical School. Massachusetts General Hospital, Psychiatry Residency Program |
| July 2006- Present | Instructor. Tufts University School of Medicine. Department of Psychiatry |
| July 2006- 2007 | Continuing Education Series on Dangerous Sex Offenders and the Law. Cambridge Educational Alliance. |
| August 2008- June 2009 | Forensic Psychiatry Clinical Clerkship. Northeastern University, Department of Psychology |
| July 2009- Present | Forensic Psychiatry Resident Elective, Massachusetts General Hospital & McLean Hospital's Adult Psychiatry Residency Program |

| | |
|---|---|
| September 2009-Present | Forensic Psychiatry Clinical Clerkship, Massachusetts School of Psychology |
| July 2011- Present | SOC-100 Psychiatry Elective, Harvard Medical School |

**Research Experience:**

"Projections of the Ventral Tegmental Area of the Rat Brain." Undergraduate Honor's Thesis. Boston University School of Medicine. 1992-1994.

"Immunocytochemistry of the Ventral Tegmental Area of the Rat Brain." University of Rochester School of Medicine. 1993.

"The Effects of Testosterone on the Visualspatial Memory of the Male Rat." University of Rochester School of Medicine. 1993.

"Behavioral Testing in Aging Primates." Boston University School of Medicine. 1995.

STEP Psychiatrist. Designed research protocol for the evaluation and treatment of Bipolar patients. Massachusetts General Hospital. 2000-2001.

"Psychopharmacologic Trials in Treatment Resistant Depression." Evaluator with the Depression Research group. Massachusetts General Hospital. 2001-2002

**Book Chapters:**

Resnick P, Sorrentino R: Chapter 8, "Forensic Considerations". *Psychosomatic Medicine*. Editors Blumenfield M. and Strain J.J. Baltimore: Lippincott, Williams and Wilkins, 2006; 91-106.

Sorrentino R: Chapter 23, "Legal and Privacy Issues in Sex Offender Law." Incrocci, L., & Rowland, D. *Handbook of Sexual Disorders*. Submitted for Publication February 2007. Hoboken, New Jersey: John Wiley & Sons, Inc. 2008.

Sorrentino R. "Sex Offenders: Treatment of." *Wiley Encyclopedia of Forensic Science*, September 2009.

Sorrentino R: Chapter on "Paraphilias." *Kaplan & Sadock's Comprehensive Textbook of Psychiatry Ninth Edition*. Baltimore: Lippincott Williams & Williams. Scheduled for publication in 2010.

Sorrentino R: Chapter on "Dementia." Encyclopedia of Immigrant Health 2012 Edition. New York: Springer. Scheduled for publication July 31, 2012.

Sorrentino R: Chapter on "Insomnia." Encyclopedia of Immigrant Health 2012 Edition. New York: Springer. Scheduled for publication July 31, 2012.

Sorrentino R: Chapter on "Menopause." Encyclopedia of Immigrant Health 2012 Edition. New York: Springer. Scheduled for publication July 31, 2012.

Sorrentino, R "Sex Offenders: Treatment of" in Wiley Encyclopedia of Forensic Science, eds A. Jamieson and A.A. Moenssens, John Wiley: Chichester. DOI: 10.1002/9780470061589.fsa604.pub2. 2013.

**Journal Articles:**

Montoya A, Sorrentino R, Lucas S, Price B. "Long-Term Neuropsychiatric Consequences of "Ecstasy" (MDMA): A critical review." *The Harvard Review of Psychiatry* 2002; Vol.10 (Number 4); 212-220.

Sorrentino R, Resnick P. "The Imposition of a NGRI Defense and the Burden of Proof in Releasing an Insanity Acquittee." *American Academy of Psychiatry and the Law Journal* 2003; Vol 31 (3).

Sorrentino R, Resnick P. "A Day in the Life of a Psychiatrist-in-the-Making." *Academic Psychiatry* 2005 Sept-Oct; 29 (4) 397-9.

Sorrentino R, Resnick P. "Forensic Issues in C-L Psychiatry." *Psychiatric Times* 2005 Dec; Vol. XXIII, Issue 14.

Sorrentino R. Review of "Playing Sick? Untangling the Web of Munchausen Syndrome, Munchausen by Proxy, Malingering, and Factitious Disorder." *Psychiatric Services* January 2006; 57:149.

Sorrentino R. Review of "Sexualized Violence against Women and Children: A Psychology and Law Perspective." *Psychiatric Services* March 2006; 57:425.

Sorrentino R. Review of "Posttraumatic Stress Disorder in Litigation: Guidelines for Forensic Assessment, 2nd Edition." *Psychiatric Services* April 2005; 56:496-497.

Sorrentino R. Review of "Violent Adolescents: Understanding the Destructive Impulse". *Psychiatric Services* June 2006; 57:890-891.

Sorrentino R. Review of "Textbook of Forensic Psychiatry". *Psychiatric Services* November 2006; 57:1662-a.

Freidman S, Sorrentino R, Stankowski J, Holden C, Resnick P. "Psychiatrists' Awareness of Maternal Filicidal Thoughts." Comprehensive Psychiatry January 2008; 106-110.

Sorrentino R, Friedman S, Lorberg G. "When the Mad are Bad: Mental Illness and Homicide." Australian and New Zeland Journal of Psychiatry, November 2007; 41(2): A224.

Friedman S, Sorrentino R, Stankowski J. "Femme Fatale: Violent Offenses Committed by Women." Australian and New Zealand Journal of Psychiatry. November 2007; 41(2): A328

Sorrentino R. Review of "Stalking: Psychiatric Perspectives and Practical Approaches". Edited by Debra A. Pinal. Volume 36, Number 1, 2008 New York: Oxford University Press. 2007. 384 pp.

Friedman S, Sorrentino R, Stankowski J, Lewis C. Resnick P. "Filicide and Case-based Risk Assessments." American Academy of Psychiatry and the Law Newsletter, January 2009; 21-22.

Friedman S, Wills C, Sorrentino R, Resnick P "Neonaticide: Phenomenology, Prevention and the Law." American Academy of Psychiatry and the Law Newsletter. April 2009; 19-20

Sorrentino R, Friedman S, Stankowski J. "Gender Bias in Forensic Psychiatry." American Academy of Psychiatry and the Law Newsletter, April 2010; 17,21.

Friedman S, Sorrentino R, Stankowski J: Postpartum Psychosis. Forensic Psychiatry and the DSM. American Academy of Psychiatry and the Law Newsletter 36(1):24-30, 2011

Sorrentino R "Degarelix: An Antagonist to GnRH-Theoretical and Treatment Considerations in Paraphilias." *Journal of Sexual Medicine* January 2012; Volume 9, Issue 1:327-329.

Sorrentino R, Reilly D, Glezer A "Transgenderism." American Academy of Psychiatry and the Law Newsletter (accepted for publication).

Sorrentino R "Traumatic Brain Injury and Competency to Stand Trial Evaluations." American Academy of Psychiatry and the Law Newsletter (accepted for publication).

Friedman S, Sorrentino R. "Infanticide, Postpartum Psychosis, and Insanity: Implications for Forensic Psychiatry." *American Academy of Psychiatry and the Law Journal* 2012 (submitted for publication).

Sorrentino, R "Criminal law: Secondary traumatic stress, vicarious trauma and burnout" *New Hampshire Bar Association News*, *23*(8), 14. February 2013.

Sorrentino R, Bauer L, Reilly D "Psychotic and Sexually Deviant." *Current Psychiatry*, 15(5), 37-42 May 2013.

**Conference Proceedings:**

Sorrentino R, "Expert Testimony" The New York Association Abusers Annual Meeting; May 2010

Sorrentino R, Ashley G. "Ethical Treatment of Sex Offenders – A Hypocrite's Oath?." The New York State Association for the Treatment of Sexual Abusers & New York State Alliance of Sex Offender Service Providers; May 2011

Sorrentino R, "Getting Off: Are Sex Offenders Criminally Responsible?" The New York State Association for the Treatment of Sexual Abusers & New York State Alliance of Sex Offender Service Providers; May 2011

Sorrentino R, Hatters-Friedman S, Jain B."Guardians and Advance Directives" American Psychiatric Association annual meeting; May 2011.

Sorrentino R, Zuchowski S, Hatters-Friedman S, Bisset R, "Competency to Stand Trial Evaluations and Traumatic Brain Injury." State of Nevada Competency Examiners Recertification Course. Southern Nevada Adult Mental Health Facility; February 2012.

Sorrentino R, "The Forensic Implications of the DSM-V's Pedohebephilia." Massachusetts Association for the Treatment of Sexual Abusers Annual Meeting; April 2012.

Sorrentino R, "Let's Talk About Sex: The Psychosexual Interview and Treatment" Psychiatric Grand Rounds at Central New York Psychiatric Center, Marcy, NY (SUNY Upstate Medical University affiliate); April 2012.

Sorrentino R, Moore S, "Dangerousness Exposed: Civil Commitment of Exhibitionists." Massachusetts Association for the Treatment of Sexual Abusers Annual Meeting; April 2012.

Sorrentino R, "Transgender." The New York State Association for the Treatment of Sexual Abusers & New York State Alliance of Sex Offender Service Providers; May 2012.

Sorrentino R, Hatters-Friedman S, "The Insanity Defense." American Psychiatric Association annual meeting; May 2012.

Sorrentino R, "Dangerous Sex Offenders: Strategies for Mental Health Professionals." The Center for Professional Innovation annual workshop; May 2012.

Sorrentino, R, "The Role of the Psychiatrist in Psychiatric Evaluations." Psychiatric Grand Rounds at St. Elizabeth's Hospital, Washington, D.C.; January, 2013.

Sorrentino R, "Evidence-Based Best Practice: Sex Offender-Specific Treatment (Part 2)." Massachusetts Association for the Treatment of Sexual Abusers Annual Meeting; April 2013.

Sorrentino R, "Gender Bender: Gender Variance and the Law." Massachusetts Association for the Treatment of Sexual Abusers Annual Meeting; April 2013.

Sorrentino R, "Female Offenders: They are Different But How Different?" Massachusetts Association for the Treatment of Sexual Abusers Annual Meeting; April 2013.

Sorrentino R. "The Mentally Ill and Guns: A Perfect Target?" American Psychiatric Association annual meeting; May 2013.